**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1180
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------- x | Case No. |
| BIOLA DANIEL, *on behalf of herself and all others similarly situated*, : | |
| Plaintiff, : | |
| : | |
| : | **CLASS ACTION COMPLAINT** |
| : | |
| - against - : | |
| : | |
| Tootsie Roll Industries, LLC, : | JURY TRIAL DEMANDED |
| Defendant. | |
| ------------------------------------------------------- x | |

Plaintiff BIOLA DANIEL, individually and on behalf of all other persons similarly situated

in New York and the United States, by her undersigned attorneys, pursuant to this Class Action

Complaint against the Defendant, TOOTSIE ROLL INDUSTRIES, LLC, alleges the following

(Based on her own knowledge and investigation of counsel):

# NATURE OF THE ACTION

1.      This is a consumer protection action arising out of deceptive and otherwise improper business practices that Defendant, TOOTSIE ROLL INDUSTRIES, LLC (hereinafter, "Tootsie" or "Defendant"), engages in with respect to the packaging of its 3.5 oz. boxed Junior Mints® chocolate covered mint candy product (hereinafter, the "Product"), which is regularly sold at convenience stores, grocery stores, and movie theaters.

2.      The Product is mass produced and packaged in non-transparent cardboard boxes of standardized size, with a standardized quantity of candy in each box.

3.      Defendant manufactures, markets and sells the Product with non-functional slack-fill in violation of the Federal Food Drug & Cosmetic Act ("FDCA") Section 403(d) (21 U.S.C. 343(d)), the Code of Federal Regulations Title 21 part 100, *et. seq.*, as well as the laws of New York State, which impose requirements identical to federal law. Defendant's containers are consequently made, formed or filled as to be misleading.

4.      Slack-fill is air or filler material within a packaged product. Non-functional slack-fill is slack-fill that serves no legitimate purpose. "The [FDA] also finds that slack-fill in excess of that necessary to accomplish a particular function is nonfunctional slack-fill." 58 FR 64123, 64127. When consumers purchase a package of Defendants' Product, they are getting less candy than they bargained for; they are effectively tricked into paying for air, because the Product boxes contain large amounts of non-functional slack-fill.

5.      Functional slack-fill is not proscribed. Functional slack-fill is slack-fill that is either: (a) necessary as part of the manufacturing process, (b) is the result of contents settling during shipping, or (c) is necessary to protect the product. Some of the Product's slack-fill maybe functional, but most is definitely non-functional.

2

6.     Defendant sold and continues to sell the Product in containers made, formed or filled, as to be misleading and with non-functional slack-fill.

7.     The size of the Product's boxes in comparison to the volume of the candy contained therein makes it appear to Plaintiff and Class members that they are buying more than what is actually being sold. Plaintiff and Class members are denied the benefit of their bargain because they pay for full boxes of the Product but actually receive far less. Reasonable comparison products (i.e. Good & Plenty candy and Milk Duds, to be described in detail below) provide for at most 23% slack-fill. Here, with respect to the Product, 43% of the box contains empty air. Consumers reasonably expect **<u>at least</u>** 77% of the box to contain candy as in Milk Duds, but only 57% of the box contains candy. Therefore, consumers receive 74% of the candy they reasonably expect to receive ($\frac{\mathbf{57\%}\text{ actual fill}}{\mathbf{77\%}\text{ expected fill}} = 74\%$). In other words, only 74% of consumers' money buys them candy in accordance with their bargain. The remaining 26% is wrongfully taken and retained by the Defendant: ($100\% - 74\% = 26\%$).

8.     The Product is packaged in a non-transparent cardboard box so that Plaintiff and Class members cannot see the non-functional slack-fill in the container. The size of the box in comparison to the volume of the Product contained therein makes it appear as though Plaintiff and Class members are buying more than what is actually being sold, as shown below:



**APPROXIMATE LINE OF FILL**

9.      The Junior Mints® Product is packaged in a non-transparent thin cardboard box that is approximately 0.75 inches in length, 3.125 inches in width, and 5.5 inches in height. The volume capacity of the cardboard box is approximately 12.89[1] cubic inches. The candy only fills the bottom 3.125 inches of the box, with 2.375 vertical inches of air. The candy occupies 57% of the box; air occupies the other 43% of the box, so the box has 43% slack-fill.

10.      While some of Defendant's slack-fill may have functional justifications related to packaging requirements or the effects of settling, Defendant's total slack-fill far exceeds the amount necessary for this, and some of the slack-fill is therefore nonfunctional slack-fill. This is proven by the fact that the slack-fill in Defendant's Product is significantly greater than the slack-fill in the packaging of comparable candies. Below is a comparison of the slack-fill in Defendant's Product with the slack-fill in a box of Good & Plenty® candy, which is produced by The Hershey Company:

---

[1] Volume of a box = length * width * height (0.75 in* 3.125 in * 5.5 in = 12.89 in$^3$).



11.    The Good & Plenty® box has similar dimensions as the Junior Mints® box, with a length of 0.75 inches, a width of 2.5 inches, a height of 6.125 inches, and a volume of about 11.48 cubic inches. The candies inside fill approximately the bottom 5.375 inches of the box, leaving only about 0.75 inches of empty space at the top of the box, i.e. merely about 12% slack-fill, significantly less than the 43% slack-fill in Junior Mints®. The candies fill approximately 10.08 cubic inches, about 88% of the container.

12.     Below is a comparison of the Tootsie's® Junior Mints® Product with a similar candy – Hershey's Milk Duds®. Milk Duds® are ovoid chocolate coated caramel candies and are unambiguously similar to Junior Mints®, which are ovoid chocolate coated mint candies in a similar shape. The Junior Mints® candy is on the left and the Milk Duds® Candy is on the right:



13.     As depicted below, Milk Duds® are packaged with about 23% slack-fill, as the candy only fills about 4.7 inches of the available 6.125 vertical inches in the box, about 77%. The 23% slack-fill in Milk Duds® is greater than the 12% slack-fill in Good & Plenty®, but still significantly less than the 43% slack-fill in Junior Mints®.



14.     Some slack-fill serves a functional purpose or exists because manufacturing

equipment does not completely fill a container and leaves some air. By comparing the box of

Defendant's Product to the boxes of comparable candies, it is easy to see that the Product

contains non-functional slack-fill. Competitors' product boxes are similar in size to Defendant's

Product boxes – yet contain far more candy. This demonstrates that it is possible to fit a greater

quantity of candy into Defendant's Product's boxes. The surplus empty space in Defendant's

Product boxes, over and above the space in a competitor's boxes, is certainly non-functional

slack-fill. When Defendant's competitor Hershey's fits more of a similar candy into a similar size box to one that the Product uses, it proves that **at least** some of the empty space in the Product boxes is unnecessary slack-fill.

15.     Each Product box is functionally identical to every other 3.5 oz. Junior Mints® chocolate-covered mint candy box with regards to precise box dimensions, candy weight, and internal fill. All 3.5 oz. Product boxes are standardized to be far more than one third full of air, with candy only occupying the remaining space. Plaintiff's Product box was a typical box that, as Plaintiff recollects, was far more than one third full of air. Class members' Product boxes were sized and filled to the common standard.

16.     A plaintiff who is sold less than what was promised by a product label has a right to recover the amount by which he overpaid. *See Lazaroff v. Paraco Gas Corp*., 2011 NY Slip Op 52541(U), ¶ 6, 38 Misc. 3d 1217(A), 1217A, 967 N.Y.S.2d 867, 867 (Sup. Ct.) ("Plaintiff alleges that, had he understood the true amount of the product, he would not have purchased it, and that he and the purported members of the class paid a higher price per gallon/pound of propane and failed to receive what was promised and/or the benefit of his bargain, i.e., a full 20 pound cylinder and the amount of propane he was promised. Thus, plaintiff has properly alleged injury") (quotations and citations omitted).

17.     The Product is misbranded regardless of any disclosures about contents settling and regardless of whether or not weight is labeled accurately. Under Federal regulations, "label statements cannot correct nonfunctional or misleading fill." Misleading Containers; Nonfunctional Slack-Fill, 58 Fed. Reg. 64123-01, 64129 (Dec. 6, 1993) (codified at 21 C.F.R. pt. 100).

18.     As the FDA explains in the Federal Register:

Consumers develop expectations as to the amount of product they are purchasing based, at least in part, on the size of the container. The congressional report that accompanied the FPLA stated: "Packages have replaced the salesman. Therefore, it is urgently required that the information set forth on these packages be sufficiently adequate to apprise the consumer of their contents and to enable the purchaser to make value comparisons among comparable products" (H.R. 2076, 89th Cong., 2d sess., p. 7 (September 23, 1966)). Thus, packaging becomes the "final salesman" between the manufacturer and the consumer, communicating information about the quantity and quality of product in a container. Further, Congress stated (S. Rept. 361, supra at 9) that "Packages only partly filled create a false impression as to the quantity of food which they contain despite the declaration of quantity of contents on the label."

58 Fed. Reg. 64123-01, 64131 (Dec. 6, 1993) (codified at 21 C.F.R. pt. 100) (emphasis added).

19.     The presence of true label statements on the Product packaging regarding weight and number of servings, if any, would not and could not mitigate the false implicit statement of quantity made by the package size. Reasonable consumers such as Plaintiff and the Class expected no more air in the packaging than would be present in other candies such as Good & Plenty®. Consumers were injured to the extent Defendant under-filled the Product containers. Plaintiff and the Class' damages are simply the proportion of the Product purchase price that Defendant collected from Plaintiff and the Class equivalent to the percent of non-functional slack-fill.

20.     Courts have noted the incorporation of FDA regulations into New York law in evaluating claims brought under NY GBL § 349. *See Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG) (RML), 2010 U.S. Dist. LEXIS 73156, at *13 (E.D.N.Y. July 21, 2010) ("New York's Agriculture and Marketing law similarly provides in relevant part that food shall be deemed misbranded '[i]f its labeling is false or misleading in any particular,' and incorporates the FDCA's labeling provisions").

21.     Plaintiff and Class members viewed Defendant's misleading Product packaging, and reasonably relied in substantial part on its implicit representations of quantity and volume when purchasing the Product. Plaintiff and Class members were thereby deceived into deciding to purchase the Product, whose packaging misrepresented the quantity of candy contained therein.

22.     Plaintiff brings this proposed consumer class action on behalf of herself and all other persons who, from the applicable limitations period up to and including the present (the "Class Period"), purchased the Product for consumption and not for resale in New York.

23.     During the Class Period, Defendant manufactured, marketed and sold the Product throughout the United States and the State of New York. Defendant purposefully sold the Product with non-functional slack-fill as part of a systematic practice.

24.     Defendant violated statutes enacted in New York that are designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

25.     Defendant has deceived Plaintiff and other consumers throughout New York by misrepresenting the actual volume of their Product, inducing Plaintiff and Class members to reasonably rely on Defendant's misrepresentations and purchase the Product when they would not have purchased otherwise (or would not have purchased at their given purchase prices). Defendant has been unjustly enriched as a result of its unlawful conduct. Through these unfair and deceptive practices, Defendant has collected millions of dollars from the sale of its Product that it would not have otherwise earned. Plaintiff brings this action to stop Defendant's deceptive practice.

26.     Plaintiff expressly does not seek to contest or enforce any state law that has requirements beyond those established by federal laws or regulations.

## JURISDICTION AND VENUE

27.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative class is a citizen of a different state than Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

28.     The Court has jurisdiction over the federal claims alleged herein pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

29.     This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendant, pursuant to New York Statute N.Y. CVP. Law § 302, because it conducts substantial business in this District.  Some of the actions giving rise to the Complaint took place in this District, and Plaintiff's claims arise out of Defendant operating, conducting, engaging in or carrying on a business or business venture in this state or having an office or agency in this state; committing a tortious act in this state; and causing injury to person or property in this state arising out of Defendant's acts and omissions outside this state. Additionally, this court has personal jurisdiction over Defendant because its Products are advertised, marketed, distributed, and sold throughout New York State; Defendant engaged in the wrongdoing alleged in this Complaint throughout the United States, including in New York State; and Defendant has sufficient minimum contacts with New York and/or has intentionally availed itself of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant is engaged in substantial and not isolated activity within New York State.

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, the Defendant has caused harm to class members residing in this District, and the Defendant is a resident of this District under 28 U.S.C. 1391(c)(2) because it is subject to personal jurisdiction in this district.

## PARTIES

### *Plaintiff*

31.     Plaintiff BIOLA DANIEL is, and at all relevant times hereto has been, a citizen of the state of New York, and resides in New York City. On September 23, 2016, Plaintiff DANIEL purchased a 3.5 oz. boxed Junior Mints® chocolate-covered mint candy product for personal consumption within the State of New York. Plaintiff DANIEL purchased the Product at Duane Reade, a pharmacy located at West 125 Street, New York, NY 10027. Plaintiff DANIEL purchased the Product for $1.49, and was financially injured as a result of Defendant's deceptive conduct as alleged herein because she did not receive the quantity that she paid for. Plaintiff DANIEL paid to receive a box of candy without non-functional slack-fill, but the box Plaintiff DANIEL received  contained approximately 40% non-functional slack-fill.

32.     As the result of Defendant's deceptive conduct as alleged herein, Plaintiff DANIEL was injured when she paid full price for the Product but did not receive a full container. She paid $1.49 for the Product on the reasonable assumption that box was filled to functional capacity. She would not have paid this sum had she known that the box was more than one third full of air or had the box been proportioned to its actual contents. Defendant promised Plaintiff DANIEL a full box of candy for $1.49, but it only delivered a partially full box, depriving her of the benefit of her bargain. Accordingly, she was injured by the shortfall in her Product box to the

extent that the box had a shortfall of candy. In other words, she was injured in the amount of the proportion of her purchase price that paid for non-functional slack-fill in the Product. Should Plaintiff DANIEL encounter the Product in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging. However, Plaintiff DANIEL would still be willing to purchase the Product, as long as Defendants engage in corrective advertising, i.e. as long as she is not compelled to pay for empty space within the container when buying the Product.

33.     Defendant's competitor The Hershey Company manufactures similar standardized mass-produced candies with far less slack-fill. Specifically, Good & Plenty® candy has only 12% slack-fill and Milk Duds® candy has only 23% slack-fill. Such slack-fill may be partially non-functional, but the Milk Duds® box demonstrates that **at most** a box of candy contains 23% functional slack-fill. Plaintiff DANIEL paid $1.49 for a 3.5 oz. box of the Product, and her box was a typical box that was about 57% full of candy, with slack-fill of about 43%. While as much as 23% of the Product box **might** contain functional slack-fill, all slack-fill in excess of that is clearly unnecessary. In other words, at least 20% of the box contains non-functional slack-fill (43% actual slack-fill – 23% functional slack-fill = 20% non-functional slack-fill). **At least** 20% of Plaintiff's box was non-functional slack-fill, because empty space in excess of the amount in the Milk Duds® box is demonstrably not necessary as part of the candy manufacturing and packaging process.

34.     **At least** 77% of Plaintiff's $1.49 Product box should have contained candy, as demonstrated by comparison to the Milk Duds box. However, only 57% of the Product box was filled with candy. Plaintiff's $1.49 should have brought her a box 77% full of candy, and so her $1.49 was allocated between the 57% of the box that contained candy and the 23% of the box

14

that is non-functional slack-fill. That is, for at least $0.39, more than one fourth of the money Plaintiff paid to purchase candy, she received no product: ($1.49 purchase price)*(20% of box with non-functional slack-fill) / (20% of box with non-functional slack-fill + 57% of box containing product) = $0.39. Plaintiff DANIEL paid $1.49 for a full box of candy, but Defendant under-filled her box by more than a third, depriving her of the benefit of her bargain.

***Defendant***

35.     Defendant TOOTSIE ROLL INDUSTRIES, LLC is a corporation organized under the laws of Illinois with its headquarters at 7401 South Cicero Avenue, Chicago, Illinois 60629 Defendant manufactured, packaged, distributed, advertised, marketed and sold the Product to millions of customers nationwide.

36.     The labeling, packaging, and advertising for the Product, relied upon by Plaintiff, were prepared and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through advertising containing the misrepresentations alleged herein. Such labeling, packaging and advertising were designed to encourage consumers to purchase the Product and reasonably misled the reasonable consumer, i.e. Plaintiff and the Class, into purchasing the Product. Defendant owned, marketed and distributed the Product, and created and/or authorized the unlawful, fraudulent, unfair, misleading and/or deceptive labeling, packaging and advertising for the Product.

## FACTUAL ALLEGATIONS

### Identical Federal and State Law Prohibit Misbranded Foods with Non-Functional Slack-Fill

37.     Under § 403(d) of the FDCA (21 U.S.C. § 343(d)), a food shall be deemed to be misbranded "[i]f its container is so made, formed, or filled as to be misleading."

38.     The FDA has implemented § 403(d) through 21 C.F.R. § 100.100, which states:

In accordance with section 403(d) of the act, a food shall be deemed to be misbranded if its container is so made, formed, or filled as to be misleading.

(a) A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack-fill. Slack-fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack-fill is the empty space in a package that is filled to less than its capacity for reasons other than:

(1) Protection of the contents of the package;

(2) The requirements of the machines used for enclosing the contents in such package;

(3) Unavoidable product settling during shipping and handling;

(4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers;

(5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages; or

(6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other non-mandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).

39.     The food labeling laws and regulations of New York impose requirements which

mirror federal law.

40.     New York Agm. Law § 201 specifically provides that "[f]ood shall be deemed to

be misbranded … If its container is so made, formed, colored or filled as to be misleading."

Moreover, Part 259.1 of Title 1 of the New York Codes, Rules and Regulations (1 NYCRR §

259.1), incorporates by reference the regulatory requirements for food labeling under the FDCA:

"For the purpose of the enforcement of article 17 of the Agriculture and Markets Law, and except where in conflict with the statutes of this State or with rules and regulations promulgated by the commissioner, the commissioner hereby adopts the

16

current regulations as they appear in title 21 of the *Code of Federal Regulations* (revised as of April 1, 2013) … in the area of food packaging and labeling as follows: … (2) Part 100 of title 21 of the *Code of Federal Regulations* [21 C.F.R. 100 et seq.], containing Federal definitions and standards for food packaging and labeling *General* at pages 5-10…."

1 NYCRR § 259.1(a)(2).

41.    Courts have noted the incorporation of FDA regulations into New York law in evaluating claims brought under NY GBL § 349.  *See Ackerman v. Coca-Cola Co*., No. CV-09-0395 (JG) (RML), 2010 U.S. Dist. LEXIS 73156, at *13 (E.D.N.Y. July 21, 2010) ("New York's Agriculture and Marketing law similarly provides in relevant part that food shall be deemed misbranded '[i]f its labeling is false or misleading in any particular,' and incorporates the FDCA's labeling provisions"); *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-cv-04697 (CM), 2016 U.S. Dist. LEXIS 149795, at *11 (S.D.N.Y. Oct. 26, 2016) ("Here [in a slack-fill case brought under NY GBL § 349], New York law expressly incorporates the standard imposed by the FDCA.").

**Defendant's Product Contains Slack-Fill**

42.    Slack-fill is the difference between the actual capacity of a container and the volume of product contained within it.

43.    Defendant's Product contains slack-fill of approximately 40%. Comparing the Product to other candies shows that most of this slack-fill is non-functional.

44.    The large amount of slack-fill in the Product boxes is in contrast to competitor The Hershey Company's Good & Plenty® and Milk Duds® candy boxes, which respectively contain only 12% and 23% slack-fill. The slack in the Good & Plenty® and Milk Duds® boxes may or may not all be functional slack, but slack in a candy box in excess of 23% is certainly non-functional, as the comparable candy boxes demonstrate. Defendant misleads consumers into purchasing its Product because consumers believe that they are purchasing a box containing only

17

candy and functional slack-fill, but the Product boxes have significant amounts of volume

occupied by non-functional slack-fill instead of candy, so consumers who purchased the Product

received far less candy than they bargained for.

**Defendant's Slack-Fill is Non-Functional**

45.     The FDA has defined non-functional slack-fill as any slack-fill in excess of that

required to achieve the functional purposes listed in 21 C.F.R. § 100.100(a):

> FDA advises that the exceptions to the definition of "nonfunctional slack-fill" in §
> 100.100(a) apply to that portion of the slack-fill within a container that is necessary
> for, or results from, a specific function or practice, e.g., the need to protect a
> product. Slack-fill in excess of that necessary to accomplish a particular function is
> nonfunctional slack-fill. Thus, the exceptions in § 100.100(a) provide only for that
> amount of slack-fill that is necessary to accomplish a specific function. FDA
> advises that these exceptions do not exempt broad categories of food, such as gift
> products and convenience foods, from the requirements of section 403(d) of the act.
> For example, § 100.100(a)(2) recognizes that some slack-fill may be necessary to
> accommodate requirements of the machines used to enclose a product in its
> container and is therefore functional slack-fill. However, § 100.100(a)(2) does not
> exempt all levels of slack-fill in all mechanically packaged products from the
> definition of nonfunctional slack-fill.

58 FR 64123, 64126 [emphasis added].

46.     Thus, the possibility that some portion of the slack-fill in Defendant's Product

may be justified as functional based on the exemptions in §100.100(a) does not justify slack-fill

that is in excess of that required to serve a legitimate purpose—protecting contents,

accommodating the machines that enclose the contents, accommodating settling, etc.  Such

slack-fill serves no purpose other than to mislead consumers about the quantity of food they are

actually purchasing.  *See Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 405 (E.D.N.Y.

2010) ("Misleading consumers is not a valid reason to package a product with slack-fill. *See* 21

C.F.R. § 100.100(a)(1–6).").

47.     The fact that Defendant's Product contains slack-fill in excess of what is

permitted under § 100.100 is proven by the fact that other similarly sized candy boxes candy

contain significantly less slack-fill. As shown above, the similarly sized boxes of Defendant's competitors contain significantly less slack-fill, and thus more candy, while under the same constraints as Defendant as to factors such as the need to protect package contents or accommodate machines and settling.

48.     The comparison is between the same kind of product in the same kind of packaging that is enclosed in the same way by the same kind of technology. And yet Defendant's competitors manage to package their candy in a way that leaves consumers with a more accurate sense of how much food they are actually purchasing. Thus, whatever real constraints <u>might</u> justify the slack-fill in the competitor candies cannot explain the excess slack-fill (shortfall) in the Junior Mints® Product.

### Defendant's Non-Functional Slack-Fill is Deceptive and Misleading

49.     The real explanation for Defendants' oversized and under-filled packaging lies in Defendants' desire to mislead consumers about how much product they are actually purchasing, thereby cutting costs and increasing sales and profits. Defendant uses non-functional slack-fill to mislead consumers into believing that they are receiving more candy than they are actually receiving.  The packaging of the Product is uniformly made out of non-transparent boxes so that consumers cannot see the slack-fill therein, thus giving Plaintiff and the Class the false impression that there is more food inside than is actually there.

50.     Even if Defendant's net weight disclosures are accurate, such does not eliminate this basic deception.  The FDA has confirmed this in unequivocal terms:

> FDA disagrees with the comments that stated that net weight statements protect against misleading fill. FDA finds that <u>the presence of an accurate net weight statement does not eliminate the misbranding</u> that occurs when a container is made, formed, or filled so as to be misleading.

58 FR 64123, 64128 [emphasis added].

Section 403(e) of the act requires packaged food to bear a label containing an accurate statement of the quantity of contents. This requirement is separate and in addition to section 403(d) of the act. <u>To rule that an accurate net weight statement protects against misleading fill would render the prohibition against misleading fill in section 403(d) of the act redundant</u>. In fact, Congress stated (S. Rept. No. 493, 73d Cong., 2d sess. 9 (1934)) in arriving at section 403(d) of the act that that section is "intended to reach deceptive methods of filling where the package is only partly filled and, <u>despite the declaration of quantity of contents on the label</u>, creates the impression that it contains more food than it does." Thus, Congress clearly intended that failure to comply with either section would render a food to be misbranded.

58 FR 64123, 64128-64129 [emphasis added].

51.     Independently from the text on the Product labels and regardless of its accuracy or inaccuracy, the size of the Product packaging makes a representation about the quantity of its contents. For Defendants' Product, this representation is false.

52.     While consumers may have come to expect significant slack-fill in boxed candy products, this too would not eliminate Defendant's deception. The FDA has stated that "although consumers may become used to the presence of nonfunctional slack-fill in a particular product or product line, the recurrence of slack-fill over an extended period of time does not legitimize such slack-fill if it is nonfunctional." 58 FR 64123, 64131.

**<u>Plaintiff and the Class Reasonably Relied on the Size of the Product's Packaging as a Material Indicator of How Much Food They Were Purchasing</u>**

53.     At the point of sale, Plaintiff and Class members did not know, and had no reason to know, that the Product contained non-functional slack-fill as set forth herein, and would not have bought the Product at the given prices had they known the truth about them.

54.     Defendant's Product packaging was a material factor in Plaintiff' and Class members' decisions to purchase the Product because reasonable consumers would attach importance to the quantity of food they believe they are purchasing.

55.     Plaintiff and the Class reasonably relied on the size of the Product's packaging to infer how much food they were purchasing and reasonably believed that the boxes were filled as

closely to capacity as functionally possible. The FDA has explained why such reliance is

reasonable:

> Consumers develop expectations as to the amount of product they are purchasing based, at least in part, on the size of the container. The congressional report that accompanied the FPLA stated: "Packages have replaced the salesman. Therefore, it is urgently required that the information set forth on these packages be sufficiently adequate to apprise the consumer of their contents and to enable the purchaser to make value comparisons among comparable products" (H.R. 2076, 89th Cong., 2d sess., p. 7 (September 23, 1966)). Thus, packaging becomes the "final salesman" between the manufacturer and the consumer, communicating information about the quantity and quality of product in a container. Further, Congress stated (S. Rept. 361, supra at 9) that "Packages only partly filled create a false impression as to the quantity of food which they contain despite the declaration of quantity of contents on the label."

58 FR 64123, 64131 [emphasis added].

56.     Congress recognized that the size of a package is in and of itself a kind of sales

pitch, even if not made with words or numbers. Thus, consumers can reasonably rely on

packaging size as a representation of quantity regardless of whatever is printed on the label.  And

manufacturers can be held responsible for non-functional slack-fill regardless of whatever else

they say.

57.     Defendant might argue that Plaintiff and the Class should not have relied on the

packaging's size to infer its contents because they could have manipulated the packaging in order

to acquire a sense of the slack-fill therein (i.e., shaking the package to hear the candy rustling or

poking it to feel the air),  but the FDA has stated that such manipulation cannot be reasonably

expected of consumers:

> FDA advises that the entire container does not need to be transparent to allow consumers to fully view its contents, i.e., a transparent lid may be sufficient depending on the conformation of the package. On the other hand, FDA finds that devices, such as a window at the bottom of a package, that require consumers to manipulate the package, e.g., turning it upside down and shaking it to redistribute the contents, do not allow consumers to fully view the contents of a container. FDA finds that such devices do not adequately ensure that consumers will not be misled as to the amount of product in a package. Therefore, such foods remain subject to

> the requirements in § 100.100(a) that slack-fill in the container be functional slack-fill.

58 FR 64123, 64128 [emphasis added].

Here, the FDA was contemplating a scenario in which manipulating a package might permit an accurate visual estimate of its contents. This is clearly impossible in the case of Defendant's wholly non-transparent packaging, which can only provide audial or tactile clues as to the Product's slack-fill. But the same basic principle applies: the possibility that manipulating a package might yield additional insight into its contents does not exculpate non-functional slack-fill (just as accurate net weight disclosures do not). The possibility of manipulating the package to discover the truth about it does not mitigate the false statement conveyed by the disproportionately large size of the product packaging.  Likewise the existence of true label statements regarding weight and quantity (if any) do not diminish Defendant's wrongdoing in using a false and misleading packaging size.

**Plaintiff and the Class Were Injured as a Result of Defendant's Deceptive Conduct**

58.    Plaintiff and Class members were injured as the result of Defendant's deceptive conduct because they paid money for less Product than Defendant represented they would be receiving.  Since they would not have agreed to this exchange had they known the truth, they were deprived of the benefit of their bargain, receiving less candy than was promised to them through the size of the Product packaging. In order for Plaintiff and Class members to be made whole, they must be compensated in an amount equal to the proportion of the purchase price equal to the percentage of non-functional slack-fill in the Product, which is equivalent to the amount of product Plaintiff and the Class paid for that Defendant did not-deliver. *See Lazaroff v. Paraco Gas Corp.*, 2011 NY Slip Op 52541(U), ¶ 6, 38 Misc. 3d 1217(A), 1217A, 967 N.Y.S.2d 867, 867 (Sup. Ct.) ("Plaintiff alleges that, had he understood the true amount of the product, he

would not have purchased it, and that he and the purported members of the class paid a higher

price per gallon/pound of propane and failed to receive what was promised and/or the benefit of

his bargain, i.e., a full 20 pound cylinder and the amount of propane he was promised…Thus,

plaintiff has properly alleged injury. Accordingly, the court finds that the plaintiff has stated a

claim for a violation of GBL § 349."); *Waldman v. New Chapter*, Inc., 714 F. Supp. 2d 398, 406

(E.D.N.Y. 2010) ("Plaintiff alleges that, had she understood 'the true amount of the product,' she

'would not have purchased' it… Thus, Plaintiff has properly alleged injury. Accordingly,

Plaintiff's § 349 claim survives Defendant's motion); *Kacocha v. Nestle Purina Petcare Co.*, No.

15-CV-5489 (KMK), 2016 U.S. Dist. LEXIS 107097, at *51-52 (S.D.N.Y. Aug. 11, 2016)

("Indeed, in his Complaint, Plaintiff seeks monetary damages on the grounds that he 'would not

have paid the premium price he paid' to buy the Products had he 'known the truth.'… Case law

makes clear that this is sufficient at the motion-to-dismiss phase for a § 349 claim to survive.").

## CLASS ACTION ALLEGATIONS

59.     Plaintiff DANIEL brings this action as a class action pursuant to Rule 23 of the

Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities in the United States who made retail
> purchases of the Products during the applicable limitations period,
> and/or such subclasses as the Court may deem appropriate ("the
> Nationwide Class").

In the alternative, Plaintiff GARCIA seeks to represent:

> All persons who made retail purchases of the Products in New
> York during the applicable limitations period, and/or such
> subclasses as the Court may deem appropriate ("the New York
> Class").

60.     The proposed Class excludes current and former officers and directors of

Defendant, members of the immediate families of the officers and directors of Defendant,

23

Defendant's legal representatives, heirs, successors, assigns, and any entity in which they have or have had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

61.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through the appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Other members of the Class may be identified from records maintained by Defendant and may be notified of the pendency of this action by mail, or by advertisement, using thn e form of notice similar to that customarily used in class actions such as this.

62.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct.

63.     Plaintiff will fairly and adequately protect the interests of the members of the Class in that Plaintiff has no interests antagonistic to those of the other members of the Class. Plaintiff has retained experienced and competent counsel.

64.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the Class to individually seek redress for the wrongful conduct alleged herein.

65.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the common questions of law and fact to the Class are:

i.  Whether Defendant labeled, packaged, marketed, advertised and/or sold Product to Plaintiff and Class members, using false, misleading and/or deceptive packaging and labeling;

ii.  Whether Defendant's actions constitute violations of 21 U.S.C. § 343(d);

iii.  Whether Defendant omitted and/or misrepresented material facts in connection with the labeling, packaging, marketing, advertising and/or sale of its Product;

iv.  Whether Defendant's labeling, packaging, marketing, advertising and/or selling of its Product constituted an unfair, unlawful or fraudulent practice;

v.  Whether the packaging of the Product during the relevant statutory period constituted unlawful non-functional slack-fill;

vi.  Whether, and to what extent, injunctive relief should be imposed on Defendant to prevent such conduct in the future;

vii.  Whether the members of the Class have sustained damages as a result of Defendant's wrongful conduct;

viii.  Whether Defendant purposely chose non-transparent Product packaging so that Plaintiff and Class members would not be able to see the amount of slack-fill contained in the Product;

ix.  The appropriate measure of damages and/or other relief;

x.  Whether Defendant has been unjustly enriched through its scheme of using false, misleading and/or deceptive labeling, packaging or misrepresentations, and;

xi.  Whether Defendant should be enjoined from continuing its unlawful practices.

66.  The membership of the Class is readily definable, and prosecution of this action as a class action will reduce the possibility of repetitious litigation. Plaintiff knows of no

difficulty which will be encountered in the management of this litigation that would preclude its maintenance as a class action.

67.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual Class member are too small to make it economically feasible for an individual Class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will prevent the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

68.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

69.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

70.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. Additionally, individual actions may be dispositive of the interest of all members of the Class, although certain Class members are not parties to such actions.

71.     Defendant's conduct is generally applicable to the Class as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Defendant's

systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

# CAUSES OF ACTION

## COUNT I

### INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar common law of other states and the District of Columbia to the extent New York common law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

72.     Plaintiff DANIEL realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

73.     Plaintiff DANIEL brings this claim individually and on behalf of the other members of the Class for an injunction for violations of New York's Deceptive Acts or Practices Law, General Business Law ("NY GBL") § 349.

74.     NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

75.     Under the New York Gen. Bus. Code § 349, it is not necessary to prove justifiable reliance. ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law [§] 349 . . . claims, it was error. Justifiable reliance by the plaintiff is not an element of the statutory claim." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. App. Div. 2012) (internal citations omitted)).

76.     The practices employed by Defendant, whereby Defendant advertised, promoted, marketed and sold its Product in packaging containing non-functional slack-fill are unfair, deceptive and misleading and are in violation of the NY GBL § 349. Moreover, New York State law broadly prohibits the misbranding of foods in language identical to that found in regulations promulgated pursuant to the FDCA § 403 (21 U.S.C. 343(d)). Under New York Agm. Law §

201, "[f]ood shall be deemed to be misbranded … If its container is so made, formed, colored or filled as to be misleading."

77.     The foregoing deceptive acts and practices were directed at consumers.

78.     Defendant should be enjoined from packaging its Product with non-functional slack-fill as described above pursuant to NY GBL § 349, New York Agm. Law § 201, and the FDCA, 21 U.S.C. § 343(d).

79.     Plaintiff DANIEL is at risk of several types of future injury, each of which justifies the imposition of an injunction. First, Defendant has misleadingly manufactured many different sizes of products with non-functional slack-fill, and so Plaintiff DANIEL may be deceived into purchasing a slack-filled Tootsie Roll® Product again (whether the exact same size and flavor as before or not), causing the same type of economic injury as enumerated in the complaint.

80.     Second, Plaintiff DANIEL is no longer being able to rely on defendant's representations, regardless of whether the representations are true or false. Third, Plaintiff DANIEL might hesitate to purchase Defendant's products even if it ceases its unlawful labeling practices and begins packaging its products without slack-fill. If the products are no longer sold with non-functional slack-fill, then Plaintiff DANIEL could not take advantage of those products because he has been misled into believing that the products have non-functional slack-fill:

> [S]ome courts have focused on the particular nature of the injury at issue to find standing. They have found at least two injuries sufficient to establish standing where the plaintiff is aware of the misrepresentation: absent an injunction, the plaintiff-consumer will 1) no longer be able to confidently rely on the defendant's representations (see *Ries*, 287 F.R.D. at 533), and 2) refrain from purchasing products in the future even if they in fact conform to her expectations (*see Lilly v. Jamba Juice Company*, No. 13-cv-02998-JST, 2015 U.S. Dist. LEXIS 34498, 2015 WL 1248027, at *3-5 (N.D. Cal. March 18, 2015). When a consumer discovers that a representation about a product is false, she doesn't know that another, later representation by the same manufacturer is also false. She just doesn't know

whether or not it's true. A material representation injures the consumer not only when it is untrue, but also when it is unclear whether or not is true.

*Duran v. Hampton Creek*, No. 3:15-cv-05497-LB, 2016 U.S. Dist. LEXIS 41650 (N.D. Cal. Mar. 28, 2016).

81.    The Court should follow the lead of California Federal Courts and recognize that a plaintiff may be injured after he learns of a manufacturer's deception, even though he is unlikely to fall victim to the exactly the same scheme again in exactly the same manner. To hold otherwise would immunize manufacturers and render injunctive relief impossible in consumer fraud class action lawsuits – if learning of a deception removed a Plaintiff's standing to seek an injunction, then wrongdoers could violate the law with impunity, defeating the purpose of consumer protection statutes.

82.    Plaintiff DANIEL, on behalf of herself and all others similarly situated, respectfully demands a judgment enjoining Defendant's conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

## COUNT II

### DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar common law of other states and the District of Columbia to the extent New York common law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

83.    Plaintiff DANIEL realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

84.    Plaintiff DANIEL brings this claim individually and on behalf of the other members of the Class for violations of NY GBL § 349.

85.     Any person who has been injured by reason of any violation of NY GBL § 349 may bring an action in her own name to enjoin such unlawful acts or practices, an action to recover her actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

86.     By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by misbranding its Product so that it appears to contain more in the packaging than is actually included.

87.     The practices employed by Defendant, whereby Defendant advertised, promoted, marketed and sold its Product in packages containing non-functional slack-fill are unfair, deceptive and misleading and are in violation of the NY GBL § 349, New York Agm. Law § 201 and the FDCA (21 U.S.C. § 343(d)) in that said Product is misbranded.

88.     The foregoing deceptive acts and practices were directed at consumers.

89.     Plaintiff DANIEL and the other Class members suffered a loss as a result of Defendant's deceptive and unfair trade practices. Specifically, as a result of Defendant's deceptive and unfair acts and practices, Plaintiff DANIEL and the other Class members suffered monetary losses from the purchase of Product, i.e., receiving less than the capacity of the packaging due to non-functional slack-fill in the Product. In order for Plaintiff DANIEL and Class members to be made whole, they must receive a refund of the purchase price of the Product equal to the percentage of non-functional slack-fill in it.

## COUNT III

## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW §§ 350 AND 350-a(1)
(FALSE ADVERTISING)

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar common law of other states and the District of Columbia to the extent New York common law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

90.     This claim is brought on behalf of Plaintiff DANIEL and members of the Class against Defendant.

91.     Plaintiff DANIEL realleges and incorporates by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

92.     Defendant has been and/or is engaged in the "conduct of … business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

93.     New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising means "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a(1).

94.     Pursuant to the FDCA as implemented through 21 C.F.R. § 100.100, package size is an affirmative representation of quantity. Thus, the non-functional slack-fill in Defendant's Product constituted false advertising as to the quantity of candy contained therein. Defendant caused this false advertising to be made and disseminated throughout New York and the United States. Defendant's false advertising was known, or through the exercise of reasonable care should have been known, by Defendant to be deceptive and misleading to consumers.

95.     Defendant's affirmative misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers purchasing the Product were, and continue to be, exposed to Defendant's material misrepresentations.

96.     Defendant has violated N.Y. Gen. Bus. Law § 350 because its misrepresentations and/or omissions regarding the Product, as set forth above, were material and likely to deceive a reasonable consumer.

97.     Plaintiff DANIEL and members of the Class have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising. In purchasing the Product, Plaintiff DANIEL and members of the Class relied on the misrepresentations regarding the quantity of the Product that was actually candy rather than non-functional slack-fill. Those representations were false and/or misleading because the Product contains substantial hidden non-functional slack-fill. Had Plaintiff and the Class known this, they would not have purchased the Product or been willing to pay as much for it.

98.     Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff DANIEL and members of the Class seek monetary damages (including actual, minimum, punitive, treble, and/or statutory damages), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**COUNT IV**

**COMMON LAW FRAUD**

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar common law of other states and the District of Columbia to the extent New York common law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

99.     Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

100.    Through its product packaging, Defendant intentionally made materially false and misleading representations regarding the quantity of candy that purchasers were actually receiving.

101.    Plaintiff and Class members were induced by, and relied upon, Defendant's false and misleading representations and did not know the truth about the Product at the time they purchased it.

102.    Defendant knew of its false and misleading representations. Defendant nevertheless continued to promote and encourage customers to purchase the Product in a misleading and deceptive manner, intending that Plaintiff and the Class rely on its misrepresentations.

103.    Had Plaintiff and the Class known the actual amount of candy they were receiving, they would not have purchased the Product.

104.    Plaintiff and Class members have been injured as a result of Defendant's fraudulent conduct.

105.    Defendant is liable to Plaintiff and Class members for damages sustained as a result of Defendant's fraud. In order for Plaintiff and Class members to be made whole, they need to receive a refund consisting of the percentage of the purchase price equal to the percentage of non-functional slack-fill in the Product.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated, seeks judgment against Defendant, as follows:

a. An Order that this action be maintained as a class action and appointing Plaintiff as representative of the Nationwide Class or, in the alternative, the New York Class;

b. An Order appointing the undersigned attorney as class counsel in this action;

c. Restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

d. All recoverable compensatory and other damages sustained by Plaintiff and the Class;

e. Actual and/or statutory damages for injuries suffered by Plaintiff and the Class and in the maximum amount permitted by applicable law;

f. An order (i) requiring Defendant to immediately cease its wrongful conduct as set forth in this Complaint; (ii) enjoining Defendant from continuing to misrepresent and conceal material information and conduct business via the unlawful, unfair and deceptive business acts and practices complained of herein; (iii) ordering Defendant to engage in a corrective advertising campaign; and (iv) requiring Defendant to reimburse Plaintiff and all members of the Class in an amount up to the purchase price of the Products;

g. Statutory pre-judgment and post-judgment interest on any amounts;

h. Payment of reasonable attorneys' fees and costs; and

i. Such other relief as the Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff, individually and on behalf of all others similarly situated, hereby demands a jury trial on all claims so triable.


Dated: October 3,  2017

Respectfully submitted,


<u>/s/ C.K. Lee</u>
By:  C.K. Lee, Esq.

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1180
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*