**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1180
Fax: 212-465-1181
*Attorneys for Plaintiffs and the Class*


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ----------------------------------------------------x | Case No. | |
| BIOLA DANIEL, ABEL DURAN, *and* : | | |
| TREKEELA PERKINS, *on behalf of* : | | |
| *themselves and all others similarly situated*, : | | |
| Plaintiffs, : | **FIRST AMENDED CLASS** | |
| : | **ACTION COMPLAINT** | |
| : | | |
| - against - : | | |
| : | | |
| Tootsie Roll Industries, LLC, : | JURY TRIAL DEMANDED | |
| Defendant. | | |
| ----------------------------------------------------x | | |

     Plaintiffs BIOLA DANIEL, ABEL DURAN, and TREKEELA PERKINS, on behalf of themselves and all other persons similarly situated in New York and the United States, by their undersigned attorneys, pursuant to this Class Action Complaint against the Defendant, TOOTSIE ROLL INDUSTRIES, LLC, alleges the following (Based on her own knowledge and investigation of counsel):

## <u>NATURE OF THE ACTION</u>

    1.    This is a consumer protection action arising out of deceptive and otherwise improper business practices that Defendant, TOOTSIE ROLL INDUSTRIES, LLC (hereinafter, "Tootsie" or "Defendant"), engages in with respect to the packaging of its Junior Mints®

chocolate covered mint candy products (hereinafter, the "Products," as set forth below), which are regularly sold at convenience stores, grocery stores, and movie theaters throughout the United States:

- 1.84 oz. box of Junior Mints®
- 3.5 oz. box of Junior Mints®
- 4.13 oz. box of Junior Mints®
- 10.5 oz. box of Junior Mints®
- Any other Junior Mints® product that is packaged in a box with more than one quarter of the box containing air.

2.      The Products are mass produced and packaged in non-transparent cardboard boxes of standardized sizes. Each Product contains a standardized amount of candy that only fills a small portion of each box, such that each box is underfilled. The size of each Product box is disproportionately large in comparison to the quantity of candy within, falsely conveying to consumers that each box contains more candy than it does.

3.      For some Products, Defendant packages different amounts of candy into the same size box. This demonstrates that Defendant does not fill boxes based on those boxes' capacity:



4.     The Product is packaged in a non-transparent cardboard box so that Plaintiff and Class members cannot see the excessive air in the container. The size of the Products' boxes in comparison to the volume of the candy contained therein makes it appear to Plaintiffs and Class members that they are buying more than what is actually being sold. Below are images of the Products with the level of fill indicated:



5.     The 1.84 oz. Product has about 1.75 vertical inches of air, 37% of the container.



6.      The 3.5 oz. Product has about 2.375 vertical inches of air, 43% of the container.



7.    The 4.13 oz. Product has about 1.9375 vertical inches of air, 35% of the container.



8.     The 10.5 oz.  Product has about 2.75 vertical inches of air, 39% of the container.

9.     Everything above the red lines is air, most of which is "non-functional slack-fill".

Defendant manufactures, markets and sells the Products with non-functional slack-fill in

violation of the Federal Food Drug & Cosmetic Act ("FDCA") Section 403(d) (21 U.S.C.

343(d)), the Code of Federal Regulations Title 21 part 100, *et. seq.*, as well as the laws of New York State, which impose requirements identical to federal law. Defendant's containers are consequently made, formed or filled as to be misleading.

10. Slack-fill is air or filler material within a packaged product. Non-functional slack-fill is slack-fill that serves no legitimate purpose. "The [FDA] also finds that slack-fill in excess of that necessary to accomplish a particular function is nonfunctional slack-fill." 58 FR 64123, 64127. When consumers purchase a package of Defendants' Product, they are getting less candy than they bargained for; they are effectively tricked into paying for air, because the Products boxes contain large amounts of non-functional slack-fill.

11. Consumers purchased the Products based on their perception of their value, and the non-functional slack-fill in the Products tricks consumers into believing that they are of higher value than they really are. Defendant charges a higher price for the candy because it tricks consumers into believing that the Products' boxes contain more candy than they do.

12. Functional slack-fill is not proscribed. Functional slack-fill is slack-fill that is either: (a) necessary as part of the manufacturing process, (b) is the result of contents settling during shipping, or (c) is necessary to protect the product. Some of the Product's slack-fill maybe functional, but most is definitely non-functional, as shown by comparison of the Products to other candy boxes.

13. Plaintiffs and Class members are denied the benefit of their bargain because they pay for full boxes of the Product but actually receive far less. Reasonably comparable candy boxes (e.g. the Milk Duds® 5.0 oz. box, described in detail below) provide for about 23% slack-fill. Here, with respect to the Products, much more of the box contains empty air. Consumers reasonably expect at least 77% of the box to contain candy as in Milk Duds®, but far less of the

box contains candy. Therefore, consumers receive only some of the candy they reasonably expect to receive. In other words, only some of consumers' money buys them candy in accordance with their bargain. The remaining amount is wrongfully taken and retained by the Defendant.

14.     Viewed another way, Defendant charges a premium in excess of the value of the relatively small amount of candy in the Products. It does so by tricking consumers into believing that each box has more candy than it does, i.e. that it is more valuable than it really is. Consumers are thereby deceived into paying a premium that is a surplus amount over the lesser value of the lesser quantity of candy they actually receive.

15.     Consumers bargain to receive a certain value: they bargain to pay for an expected volume of candy at that value but do not receive it. Instead, they receive only some candy at the bargained-for rate, and the extra amount that consumers pay beyond this is a premium entirely in excess of the portion of the total price that gets them candy.

16.     Consumers pay a premium price for the purportedly functionally full Product boxes, which are priced as if they contained only candy and functional slack-fill. Had consumers known the truth, they would not have paid the full purchase price, which includes the premium that pays for non-functional slack-fill. Thus, consumers were injured in the amount of this price premium they paid, which they would not have been willing to pay had they not been deceived about the Products. The price consumers, including Plaintiffs and the Class, pay for the Products is higher as a result of Defendant's deception.

17.     While some of Defendant's slack-fill may have functional justifications related to packaging requirements or the effects of settling, Defendant's total slack-fill far exceeds the amount necessary, and some of the slack-fill is therefore nonfunctional slack-fill. This is proven

8

by the fact that the slack-fill in Defendant's Products is significantly greater than the slack-fill in the packaging of comparable candies. Below is a comparison of the slack-fill in Defendant's 3.5 oz. Product with the slack-fill in a box of Milk Duds® candy, which is produced by The Hershey Company:



18.    The 3.5 oz. Product is packaged in a non-transparent thin cardboard boxes that is approximately 0.75 inches in length, 3.25 inches in width, and 5.5 inches in height. The volume capacity of the cardboard box is approximately 13.41[1] cubic inches. The candy only fills the

---

[1] Volume of a box = length * width * height (0.75 in* 3.25 in * 5.5 in = 13.41 in$^3$).

bottom 3.125 inches of the box, with 2.375 vertical inches of air. The candy occupies 57% of the box; air occupies the other 43% of the box, so the box has 43% slack-fill.

19.     The 5.0 oz. Milk Duds® box has similar dimensions as the Junior Mints® box, with a length of 0.9375 inches, a width of 2.625 inches, a height of 6.125 inches, and a volume of about 15.07 cubic inches. The candies inside fill approximately the bottom 4.7 inches of the box, leaving only about 1.425 inches of empty space at the top of the box, i.e. merely about 23% slack-fill, significantly less than the 43% slack-fill in Junior Mints®. The candies fill approximately 11.57 cubic inches, about 77% of the container.

20.     Milk Duds® are ovoid chocolate coated caramel candies and are unambiguously similar to Junior Mints®, which are ovoid chocolate coated mint candies in a similar shape. The Junior Mints® candy is on the left and the Milk Duds® Candy is on the right:



21.     As depicted below, Milk Duds® are packaged with about 23% slack-fill, as the candy only fills about 4.7 inches of the available 6.125 vertical inches in the box, about 77%,

leaving about 1.425 inches of air, which is about 23% total slack-fill. The 23% slack-fill in Milk Duds® is significantly less than the 43% slack-fill in the 3.5 oz. Junior Mints® Product.

22.     Some slack-fill serves a functional purpose or exists because manufacturing equipment does not completely fill a container and leaves some air. By comparing the box of Defendant's Products to the boxes of comparable candies, it is easy to see that the Product contains non-functional slack-fill. Competitors' product boxes are similar in size to Defendant's Product boxes – yet contain far more candy. This demonstrates that it is possible to fit a greater quantity of candy into the Product boxes. The surplus empty space in Defendant's Product boxes, over and above the space in a competitor's boxes, is certainly non-functional slack-fill. When Defendant's competitor Hershey's fits more of a similar candy into a similar size box to one that the Product uses, it proves that **at least** some of the empty space in the Product boxes is unnecessary slack-fill.

23.     This conclusion is reinforced by comparison of the 3.5 oz. and 4.13 oz. Product boxes, which are of identical dimensions. The difference in fill level between the 3.5 oz. and 4.13 oz. Product boxes (about .4375 vertical inches of fill when the boxes are held upright) is entirely comprised of non-functional slack-fill.

24.     By distributing the 3.5 oz. and 4.13 oz. Products, which have identically sized boxes but different levels of fill, Defendant has demonstrated that it does not fill candy boxes based on those boxes' capacity. This reinforces the same conclusion that is already apparent from comparing the Product to competitors' candy boxes—the Products have substantial non-functional slack-fill.

25.     Each Product's box is functionally identical to every other Junior Mints® chocolate-covered mint candy box labeled as containing that same quantity of candy with

regards to precise box dimensions, candy weight, and internal fill. All Product boxes are standardized to be far more than one third full of air, with candy only occupying the remaining space. Plaintiffs' Product boxes were a typical box that, as Plaintiffs recollect, were far more than one third full of air. Class members' Product boxes were sized and filled to the common standard for that Product.

26.   A plaintiff who is sold less than what was promised by a product label has a right to recover the amount by which he overpaid. *See Lazaroff v. Paraco Gas Corp.*, 2011 NY Slip Op 52541(U), ¶ 6, 38 Misc. 3d 1217(A), 1217A, 967 N.Y.S.2d 867, 867 (Sup. Ct.) ("Plaintiff alleges that, had he understood the true amount of the product, he would not have purchased it, and that he and the purported members of the class paid a higher price per gallon/pound of propane and failed to receive what was promised and/or the benefit of his bargain, i.e., a full 20 pound cylinder and the amount of propane he was promised. Thus, plaintiff has properly alleged injury") (quotations and citations omitted).

27.   Plaintiffs and Class members viewed Defendant's misleading Product packaging, and reasonably relied in substantial part on its implicit representations of quantity, size, and volume when purchasing the Products. Plaintiffs and Class members were thereby deceived into deciding to purchase the Products, whose packaging misrepresented the quantity of candy contained therein.

28.   Plaintiffs bring this proposed consumer class action on behalf of themselves and all other persons who, from the applicable limitations period up to and including the present (the "Class Period"), purchased the Products for consumption and not for resale in New York.

29.   During the Class Period, Defendant manufactured, marketed and sold the Products throughout the United States, including New York, and Mississippi. Defendant

12

purposefully sold the Products with non-functional slack-fill as part of a systematic practice.
Defendant sold and continues to sell the Product in containers made, formed or filled, as to be
misleading and with non-functional slack-fill.

30.     Defendant violates statutes enacted in each of the fifty states and the District of
Columbia that are designed to protect consumers against unfair, deceptive, fraudulent,
unconscionable trade and business practices, and false advertising. These statutes are:

1)  Alabama Deceptive Trade Practices Act, Ala. Statues Ann. §§ 8-19-1, *et seq.;*
2)  Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.;*
3)  Arizona Consumer Fraud Act, Arizona Revised Statutes, §§ 44-1521, *et seq.;*
4)  Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.;*
5)  California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.,* and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.;*
6)  Colorado Consumer Protection Act, Colo. Rev. Stat. § 6 - 1-101, *et seq.;*
7)  Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.;*
8)  Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.;*
9)  District of Columbia Consumer Protection Procedures Act, D.C. Code § 28 3901, *et seq.;*
10) Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.;*
11) Georgia Fair Business Practices Act, § 10-1-390 *et seq.;*
12) Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1, *et seq.,* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.;*
13) Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.;*
14) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.;*
15) Indiana Deceptive Consumer Sales Act, Indiana Code Ann. §§ 24-5-0.5-0.1, *et seq.;*
16) Iowa Consumer Fraud Act, Iowa Code §§ 714.16, *et seq.;*
17) Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.;*
18) Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.;*
19) Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § § 51:1401, *et seq.;*
20) Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq,,* and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.,*
21) Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.;*
22) Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;
23) Michigan Consumer Protection Act, § § 445.901, *et seq.;*
24) Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.;* and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.;*
25) Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.;*
26) Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.;*
27) Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.;*
28) Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59 1601, *et seq.,* and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.;*
29) Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.;*
30) New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq. ;*

13

*31)* New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 *1, et seq.;*
*32)* New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 *1, et seq.;*
*33)* New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.;*
*34)* North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.;*
*35)* North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes §§ 75-1, *et seq.;*
*36)* Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. §§ 4165.01. *et seq.;*
*37)* Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.;*
*38)* Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.;*
*39)* Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § § 201-1, *et seq.;*
*40)* Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.;*
*41)* South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.;*
*42)* South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 *1, et seq.;*
*43)* Tennessee Trade Practices Act, Tennessee Code Annotated §§ 47-25-101, *et seq.;*
*44)* Texas Stat. Ann. §§ 17.41, *et seq.,* Texas Deceptive Trade Practices Act, *et seq.;*
*45)* Utah Unfair Practices Act, Utah Code Ann. §§ 13-5-1, *et seq.;*
*46)* Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.;*
*47)* Virginia Consumer Protection Act, Virginia Code Ann. §§59.1-196, *et seq.;*
*48)* Washington Consumer Fraud Act, Wash. Rev, Code § 19.86.010, *et seq.;*
*49)* West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.;*
*50)* Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100. 18, *et seq.;*
*51)* Wyoming Consumer Protection Act, Wyoming Stat. Ann. §§40-12-101, *et seq.*

31.     Defendant has deceived Plaintiffs and other consumers by misrepresenting the actual volume of their Products, inducing Plaintiffs and Class members to reasonably rely on Defendant's misrepresentations to purchase the Products when they would not have purchased otherwise (or would not have purchased at their given purchase prices). Defendant has been unjustly enriched as a result of its unlawful conduct. Through these unfair and deceptive practices, Defendant has collected millions of dollars from the sale of its Products. Plaintiffs brings this action to stop Defendant's deceptive practice.

32.     Plaintiffs do not seek to contest or enforce any state law that has requirements beyond those established by federal laws or regulations.

## JURISDICTION AND VENUE

33.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative class is a citizen of a different state than Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

34.     The Court has jurisdiction over the federal claims alleged herein pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

35.     This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendant, pursuant to New York Statute N.Y. CVP. Law § 302, because it conducts substantial business in this District. Some of the actions giving rise to the Complaint took place in this District, and Plaintiff's claims arise out of Defendant operating, conducting, engaging in or carrying on a business or business venture in this state or having an office or agency in this state; committing a tortious act in this state; and causing injury to person or property in this state arising out of Defendant's acts and omissions outside this state. Additionally, this court has personal jurisdiction over Defendant because its Products are advertised, marketed, distributed, and sold throughout New York State; Defendant engaged in the wrongdoing alleged in this Complaint throughout the United States, including in New York State; and Defendant has sufficient minimum contacts with New York and/or has intentionally availed itself of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant is engaged in substantial and not isolated activity within New York State.

36.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, the

Defendant has caused harm to class members residing in this District, and the Defendant is a resident of this District under 28 U.S.C. 1391(c)(2) because it is subject to personal jurisdiction in this district.

# PARTIES

*Plaintiff*

37.     Plaintiff BIOLA DANIEL is, and at all relevant times hereto has been, a citizen of the state of New York, and resides in New York City. On September 23, 2016, Plaintiff DANIEL purchased a 3.5 oz. boxed Junior Mints® chocolate-covered mint candy Product for personal consumption within the State of New York. Plaintiff DANIEL purchased the Product at Duane Reade, a pharmacy located at West 125 Street, New York, NY 10027. Plaintiff DANIEL purchased the Product for $1.49, and was financially injured as a result of Defendant's deceptive conduct as alleged herein because she did not receive the quantity that she paid for. Plaintiff DANIEL paid to receive a box of candy without non-functional slack-fill, but the box Plaintiff DANIEL received contained approximately 43% non-functional slack-fill.

38.     As the result of Defendant's deceptive conduct as alleged herein, Plaintiff DANIEL was injured when she paid full price for her Product but did not receive a full container. She paid $1.49 for the Product on the reasonable assumption that box was filled to functional capacity. She would not have paid this sum had she known that the box was more than one third full of air or had the box been proportioned to its actual contents. Defendant promised Plaintiff DANIEL a full box of candy for $1.49, but it only delivered a partially full box, depriving her of the benefit of her bargain. Accordingly, she was injured by the shortfall in her Product box to the extent that the box had a shortfall of candy. In other words, she was injured in

the amount of the proportion of her purchase price that paid for non-functional slack-fill in the Product.

39.     Plaintiff DANIEL was injured as a direct result of Defendant's deceptive practices. Had the Product been accurately advertised, it would have been sold for less. Larger quantities of Junior Mints® candy cost more than smaller quantities of it, and Defendant marketed to Plaintiff DANIEL a small quantity of candy as if it were a large quantity.

40.     Plaintiffs could not rely on the truthfulness of the packaging absent corrective changes if they encounter the Products in the future. However, Plaintiff DANIEL would still be willing to purchase the Product, as long as Defendant engages in corrective advertising, i.e. as long as she is not compelled to pay for empty space within the container when buying the Product.

41.     Defendant's competitor The Hershey Company manufactures similar standardized mass-produced candies with far less slack-fill. Specifically, Milk Duds® candy has only about 23% slack-fill.[2] Such slack-fill may be partially non-functional, but the Milk Duds® box demonstrates that **at most** a box of candy contains 23% functional slack-fill. Plaintiff DANIEL paid $1.49 for a 3.5 oz. box of the Product, and her box was a typical box that was about 57% full of candy, with slack-fill of about 43%. While as much as 23% of the Product box **might** contain functional slack-fill, all slack-fill in excess of that is clearly unnecessary. In other words, at least 20% of the box contains non-functional slack-fill (43% actual slack-fill – 23% functional slack-fill = 20% non-functional slack-fill). **At least** 20% of Plaintiff's box was non-functional slack-fill, because empty space in excess of the amount in the Milk Duds® box is demonstrably not necessary as part of the candy manufacturing and packaging process.

---

[2] About 1.425 inches of slack-fill out of 6.125 total available vertical inches of space.

42.     **At least** 77% of Plaintiff's $1.49 Product box should have contained candy, as demonstrated by comparison to the Milk Duds® box. However, only 57% of the Product box was filled with candy. Plaintiff's $1.49 should have brought her a box 77% full of candy, and so her $1.49 was allocated between the 57% of the box that contained candy and the 20% of the box that is non-functional slack-fill. That is, for at least $0.39, more than one fourth of the money Plaintiff paid to purchase candy, she received no product: ($1.49 purchase price)*(20% of box with non-functional slack-fill) / (77% of box that should have contained candy) = $0.39. Plaintiff DANIEL paid $1.49 for a full box of candy, but Defendant under-filled her box by more than a third, depriving her of the benefit of her bargain.

43.     Plaintiff DURAN is, and at all relevant times hereto has been, a citizen of the state of New York, and resides in Queens County. December 28, 2017, Plaintiff DURAN purchased a 4.13 oz. box of Junior Mints® XL chocolate-covered mint candy for personal consumption. Plaintiff DURAN purchased the Product at an AMC Theater location at 630 Old Country Rd, Garden City, NY 11530, in Nassau County. Plaintiff DURAN purchased the Product for $4.49, and was financially injured as a result of Defendant's deceptive conduct as alleged herein because she did not receive the quantity that she paid for and was promised. Plaintiff DURAN paid to receive a box of candy that was functionally full, but the box Plaintiff DURAN received contained more than one third slack-fill, with most of it being non-functional slack-fill.

44.     As the result of Defendant's deceptive conduct as alleged herein, Plaintiff DURAN was injured when he paid full price for the Product but did not receive a full container. He would not have paid this sum had she known that the bag was less than half full. Plaintiff was injured by the shortfall in his Product box. He was injured in the amount of the proportion of his

purchase price that paid for non-functional slack-fill in the Product. Plaintiff DURAN is willing

to purchase the Products in the future and plans to purchase them in the near future, however, he

is concerned that he cannot rely on the truthfulness of the packaging.

45.     **At least** 77% of Plaintiff DURAN's $4.49 Product box should have contained

candy, as demonstrated by comparison to the Milk Duds® box. However, only about 65% of the

Product box was filled with candy. Plaintiff's $4.49 should have brought him a box 77% full of

candy, and so his $4.49 was allocated between the 65% of the box that contained candy and the

12% of the box that is non-functional slack-fill. That is, for at least $0.70, he received no

product: ($4.49 purchase price)*(12% of box with non-functional slack-fill) / (77% of box that

should have contained candy) = $0.70. Plaintiff DURAN paid $4.49 for a full box of candy, but

Defendant under-filled his box, depriving him of the benefit of his bargain.

46.     Plaintiff PERKINS is, and at all relevant times hereto has been, a citizen of the

state of Mississippi, and resides in Jackson County. Plaintiff PERKINS purchased boxes of

Junior Mints® chocolate-covered mint candy for personal consumption in several sizes,

including the 3.5 oz. size, on several occasions at Walmart and grocery stores. Plaintiff

PERKINS purchased Products for about $1.00 – $1.29, and was financially injured as a result of

Defendant's deceptive conduct as alleged herein because she did not receive the quantity that she

paid for and was promised, regardless of which size box she purchased. Plaintiff PERKINS paid

to receive boxes of candy that were functionally full, but the boxes Plaintiff PERKINS received

contained approximately more than one third slack-fill, with most of it being non-functional

slack-fill.

47.     As the result of Defendant's deceptive conduct as alleged herein, Plaintiff

PERKINS was injured when she paid full price for the Products but did not receive full

containers. She would not have paid the amount she did had she known that the boxes were more than one third air. Plaintiff was injured by the shortfall in her Product boxes. She was injured in the amount of the proportion of her purchase price that paid for non-functional slack-fill in her Products. The amount of her damages can be established by expert testimony at trial.

48.     Plaintiff PERKINS has been a repeat purchaser of the Products, believing that some might not have non-functional slack-fill despite her knowledge of individual cases in which Products contained non-functional slack-fill. Plaintiff PERKINS is willing to purchase the Products in the future and plans to purchase them in the near future, however, she is concerned that she cannot rely on the truthfulness of the packaging.

*Defendant*

49.     Defendant TOOTSIE ROLL INDUSTRIES, LLC is a corporation organized under the laws of Illinois with its headquarters at 7401 South Cicero Avenue, Chicago, Illinois 60629 Defendant manufactured, packaged, distributed, advertised, marketed and sold the Product to millions of customers nationwide.

50.     The labeling, packaging, and advertising for the Product, relied upon by Plaintiffs, were prepared and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through advertising containing the misrepresentations alleged herein. Such labeling, packaging and advertising were designed to encourage consumers to purchase the Products and reasonably misled the reasonable consumer, i.e. Plaintiffs and the Class, into purchasing the Products. Defendant owned, markets and distributes the Products, and creates and/or authorized the unlawful, fraudulent, unfair, misleading and/or deceptive labeling, packaging and advertising for the Products.

# FACTUAL ALLEGATIONS

## Identical Federal and State Law Prohibit Misbranded Foods with Non-Functional Slack-Fill

51.     Under § 403(d) of the FDCA (21 U.S.C. § 343(d)), a food shall be deemed to be

misbranded "[i]f its container is so made, formed, or filled as to be misleading."

52.     The FDA has implemented § 403(d) through 21 C.F.R. § 100.100, which states:

In accordance with section 403(d) of the act, a food shall be deemed to be misbranded if its container is so made, formed, or filled as to be misleading.

(a) A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack-fill. Slack-fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack-fill is the empty space in a package that is filled to less than its capacity for reasons other than:

(1) Protection of the contents of the package;

(2) The requirements of the machines used for enclosing the contents in such package;

(3) Unavoidable product settling during shipping and handling;

(4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers;

(5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages; or

(6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other non-mandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).

53.     The food labeling laws and regulations of New York impose requirements which

mirror federal law.

54.     New York Agm. Law § 201 specifically provides that "[f]ood shall be deemed to be misbranded … If its container is so made, formed, colored or filled as to be misleading." Moreover, Part 259.1 of Title 1 of the New York Codes, Rules and Regulations (1 NYCRR § 259.1), incorporates by reference the regulatory requirements for food labeling under the FDCA:

> "For the purpose of the enforcement of article 17 of the Agriculture and Markets Law, and except where in conflict with the statutes of this State or with rules and regulations promulgated by the commissioner, the commissioner hereby adopts the current regulations as they appear in title 21 of the *Code of Federal Regulations* (revised as of April 1, 2013) … in the area of food packaging and labeling as follows: … (2) Part 100 of title 21 of the *Code of Federal Regulations* [21 C.F.R. 100 et seq.], containing Federal definitions and standards for food packaging and labeling *General* at pages 5-10…."

1 NYCRR § 259.1(a)(2).

55.     Courts have noted the incorporation of FDA regulations into New York law in evaluating claims brought under NY GBL § 349. *See Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG) (RML), 2010 U.S. Dist. LEXIS 73156, at *13 (E.D.N.Y. July 21, 2010) ("New York's Agriculture and Marketing law similarly provides in relevant part that food shall be deemed misbranded '[i]f its labeling is false or misleading in any particular,' and incorporates the FDCA's labeling provisions"); *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-cv-04697 (CM), 2016 U.S. Dist. LEXIS 149795, at *11 (S.D.N.Y. Oct. 26, 2016) ("Here [in a slack-fill case brought under NY GBL § 349], New York law expressly incorporates the standard imposed by the FDCA.").

**Defendant's Products Contain Slack-Fill**

56.     Slack-fill is the difference between the actual capacity of a container and the volume of product contained within it. All the Products contain non-functional slack-fill, as outlined below:

57.     The 1.84 oz. Product is packaged in a non-transparent thin cardboard box that is approximately 0.75 inches in length, 1.88 inches in width, and 4.75 inches in height. The volume capacity of the cardboard box is approximately 6.68[3] cubic inches. The candy only fills the bottom 3 inches of the box, with 1.75 vertical inches of air. The candy occupies 63% of the box; air occupies the other 37% of the box, so the box has 37% slack-fill.

58.     The 3.5 oz. Product is packaged in a non-transparent thin cardboard box that is approximately 0.75 inches in length, 3.25 inches in width, and 5.5 inches in height. The volume capacity of the cardboard box is approximately 13.41[4] cubic inches. The candy only fills the bottom 3.125 inches of the box, with 2.375 vertical inches of air. The candy occupies 57% of the box; air occupies the other 43% of the box, so the box has 43% slack-fill.

59.     The 4.13 oz. Product is packaged in a non-transparent thin cardboard box that is approximately 0.75 inches in length, 3.25 inches in width, and 5.5 inches in height. The volume capacity of the cardboard box is approximately 13.41[5] cubic inches. The candy only fills the bottom 3.5625 inches of the box, with 1.9375 vertical inches of air. The candy occupies 65% of the box; air occupies the other 35% of the box, so the box has 35% slack-fill.

60.     The 10.5 oz. Product is packaged in a non-transparent thin cardboard box that is approximately 1 inch in length, 4.5 inches in width, and 7 inches in height. The volume capacity of the cardboard box is approximately 31.5[6] cubic inches. The candy only fills the bottom 4.25 inches of the box, with 2.75 vertical inches of air. The candy occupies 61% of the box; air occupies the other 39% of the box, so the box has 39% slack-fill.

---

[3] Volume of a box = length * width * height (0.75 in* 1.88 in * 4.75 in = 6.68 in$^3$).
[4] Volume of a box = length * width * height (0.75 in* 3.25 in * 5.5 in = 13.41 in$^3$).
[5] Volume of a box = length * width * height (0.75 in* 3.25 in * 5.5 in = 13.41 in$^3$).
[6] Volume of a box = length * width * height (1 in* 4.5 in * 7 in = 31.50 in$^3$).

**Defendant's Slack-Fill is Substantially Non-Functional and is Deceptive and Misleading**

61.     Comparing the Products to other candies shows that most of the slack-fill in the Products is non-functional.

62.     The large amount of slack-fill in the Product boxes is in contrast to competitor The Hershey Company's Milk Duds® candy boxes, which contain only 23% slack-fill. The slack in the Milk Duds® boxes may or may not all be functional slack, but slack in a candy box in excess of 23% is certainly non-functional, as the comparable candy boxes demonstrate. Defendant misleads consumers into purchasing its Product because consumers believe that they are purchasing a box containing only candy and functional slack-fill, but the Product boxes also have non-functional slack-fill instead of candy, so consumers who purchased the Products receive far less candy than they bargained for.

63.     The real explanation for Defendants' oversized and under-filled packaging lies in Defendants' desire to mislead consumers about how much product they are actually purchasing, thereby cutting costs and increasing sales and profits. Defendant uses non-functional slack-fill to mislead consumers into believing that they are receiving more candy than they are actually receiving. The packaging of the Product is uniformly made out of non-transparent cardboard so that consumers cannot see the slack-fill therein, thus giving Plaintiffs and the Class the false impression that there is more food inside than is actually there. This allows Defendant to charge more for the Products. The excessive air in the Products thereby causes Plaintiffs and the Class to pay more than they otherwise would have paid and causes Plaintiffs and the Class economic injury.

24

**The Safe-Harbor Provisions of 21 C.F.R. § 100.100 Do Not Justify the Slack-Fill in Defendant's Products**

64.     The FDA has defined non-functional slack-fill as any slack-fill in excess of that required to achieve the functional purposes listed in 21 C.F.R. § 100.100(a):

> FDA advises that the exceptions to the definition of "nonfunctional slack-fill" in § 100.100(a) apply to that portion of the slack-fill within a container that is necessary for, or results from, a specific function or practice, e.g., the need to protect a product. Slack-fill in excess of that necessary to accomplish a particular function is nonfunctional slack-fill. Thus, the exceptions in § 100.100(a) provide only for that amount of slack-fill that is necessary to accomplish a specific function. FDA advises that these exceptions do not exempt broad categories of food, such as gift products and convenience foods, from the requirements of section 403(d) of the act. For example, § 100.100(a)(2) recognizes that some slack-fill may be necessary to accommodate requirements of the machines used to enclose a product in its container and is therefore functional slack-fill. However, § 100.100(a)(2) does not exempt all levels of slack-fill in all mechanically packaged products from the definition of nonfunctional slack-fill.

58 FR 64123, 64126 [emphasis added].

65.     Thus, the possibility that some portion of the slack-fill in Defendant's Product may be justified as functional based on the exemptions in §100.100(a) does not justify slack-fill that is in excess of that required to serve a legitimate purpose—protecting contents, accommodating the machines that enclose the contents, accommodating settling, etc. Such slack-fill serves no purpose other than to mislead consumers about the quantity of food they are actually purchasing. *See Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 405 (E.D.N.Y. 2010) ("Misleading consumers is not a valid reason to package a product with slack-fill. *See* 21 C.F.R. § 100.100(a)(1–6).").

66.     The fact that Defendant's Products contains slack-fill in excess of what is permitted under § 100.100 is proven by the fact that other similarly sized candy boxes contain significantly less slack-fill. As shown above, the similarly sized boxes of Defendant's competitor contain significantly less slack-fill, and thus more candy, despite being under the same

constraints as Defendant as to factors such as the need to protect package contents, accommodate machines, and settling.

67.    The comparison is between the same kind of products in the same kind of packaging that is enclosed in the same way by the same kind of technology. And yet Defendant's competitors manage to package their candy in a way that leaves consumers with a more accurate sense of how much food they are actually purchasing. Thus, whatever real constraints might justify the slack-fill in the competitor candies cannot explain the excess slack-fill (shortfall) in the Junior Mints® Product. This logic applies for every safe-harbor provision of 21 C.F.R. § 100.100(a)(1–6), as follows:

**(1) Protection of the contents of the package;**

68.    Competitors who package similar candies protect their candy with far less slack-fill than is in the Products. Any slack-fill in the Products that exceeds the amount of slack-fill in competitors' products therefore clearly does not qualify for this safe harbor because that slack is demonstrably not necessary to protect the contents of the package.

**(2) The requirements of the machines used for enclosing the contents in such package;**

69.    Competitors who package similar candy enclose the candy in substantially similar cardboard boxes with far less slack-fill than is in the Products. Any slack-fill in the Products that exceeds the amount of slack-fill in competitors' products therefore clearly does not qualify for this safe harbor because machines that enclose candy do not require such extensive slack-fill.

**(3) Unavoidable product settling during shipping and handling;**

70.    The outer layer of Junior Mints candy is solid chocolate. There is little or no setting for this type of candy. Competitor's candies with similar composition, such as Milk Duds®, undergo the same minimal or zero amount of settling, but any such settling in Milk

26

Dude does not create total slack-fill of more than about 23%. This is in contrast to the 39-43%

slack-fill that is in the Products. Any slack-fill in the Products that exceeds the amount of slack-

fill in the competitor's Milk Duds® product therefore clearly does not qualify for this safe harbor

because chocolate candy demonstrably can be shipped without 43% settling. Neither settling nor

any other cause introduces such a large amount of slack-fill into competitor's Milk Duds®,

therefore the slack-fill in the Products that is in excess of the slack-fill in competitor's Milk

Duds® is demonstrably not "unavoidable" because other manufacturers in fact avoid it, so the

safe harbor does not apply to the Products.

> **(4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers;**

71.     Competitor's similar candy in substantially identical packaging is designed to be

eaten in the same manner as the Products, but nothing about this compels the competitor to

introduce slack-fill in their candy boxes. Any slack-fill in the Products that exceeds the amount

of slack-fill in competitor's product therefore does not qualify for this safe harbor because there

is no special function performed by the packaging that requires this slack-fill in a candy box (and

if there is such a function it is not communicated to consumers).

> **(5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages;**

72.     This safe-harbor equally does not apply to either the Products or competitor's

candy boxes because the cardboard boxes are not significantly valuable.

> **(6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other non-mandatory**

**designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).**

73.     Competitor's similar candy is packaged and sold in the same stores as the Products in packages of similar size, but nothing about this prevents those competitors from fully filling their candy boxes with only candy and functional slack-fill. Any slack-fill in the Products that exceeds the amount of slack-fill in competitors' products therefore clearly does not qualify for this safe harbor because it is demonstrably possible to simply fill the boxes with candy until there is less than 25% slack remaining, as shown by competitors' candy products.

**Plaintiffs and the Class Reasonably Relied on the Size of the Product's Packaging as a Material Indicator of How Much Food They Were Purchasing**

74.     At the point of sale, Plaintiffs and Class members did not know, and had no reason to know, that the Products contained non-functional slack-fill as set forth herein, and consumers would not have bought the Products at the given prices had they known the truth about them.

75.     Defendant's Products' packaging is a material factor in Plaintiffs and Class members' decisions to purchase the Products because reasonable consumers would attach importance to the quantity of food they believe they are purchasing.

76.     Plaintiffs and the Class reasonably relied on the size of the Product's packaging to infer how much food they were purchasing and reasonably believed that the boxes were filled as closely to capacity as functionally possible. The FDA has explained why such reliance is reasonable:

> Consumers develop expectations as to the amount of product they are purchasing based, at least in part, on the size of the container. The congressional report that accompanied the FPLA stated: "Packages have replaced the salesman. Therefore, it is urgently required that the information set forth on these packages be sufficiently adequate to apprise the consumer of their contents and to enable the purchaser to make value comparisons among comparable products" (H.R. 2076, 89th Cong., 2d sess., p. 7 (September 23, 1966)). Thus, packaging becomes the

28

"final salesman" between the manufacturer and the consumer, communicating information about the quantity and quality of product in a container. Further, Congress stated (S. Rept. 361, supra at 9) that "Packages only partly filled create a false impression as to the quantity of food which they contain despite the declaration of quantity of contents on the label."

58 FR 64123, 64131 [emphasis added].

77.    Congress recognized that the size of a package is in and of itself a kind of sales pitch, even if not made with words or numbers. Thus, consumers can reasonably rely on packaging size as a representation of quantity regardless of whatever is printed on the label. And manufacturers can be held responsible for non-functional slack-fill regardless of whatever else they say.

**Reasonable Consumers Rely on Label Representations and Are Not Required to Manipulate Food Packaging**

78.    Defendant might argue that Plaintiffs and the Class should not have relied on the packaging's size to infer its contents because they could have manipulated the packaging in order to acquire a sense of the slack-fill therein (i.e., shaking the package to hear the candy rustling or poking it to feel the air), but the FDA has stated that such manipulation cannot be reasonably expected of consumers:

FDA advises that the entire container does not need to be transparent to allow consumers to fully view its contents, i.e., a transparent lid may be sufficient depending on the conformation of the package. On the other hand, FDA finds that devices, such as a window at the bottom of a package, that require consumers to manipulate the package, e.g., turning it upside down and shaking it to redistribute the contents, do not allow consumers to fully view the contents of a container. FDA finds that such devices do not adequately ensure that consumers will not be misled as to the amount of product in a package. Therefore, such foods remain subject to the requirements in § 100.100(a) that slack-fill in the container be functional slack-fill.

58 FR 64123, 64128 [emphasis added].

Here, the FDA was contemplating a scenario in which manipulating a package might permit an accurate visual estimate of its contents. This is clearly impossible in the case of Defendant's

wholly non-transparent packaging, which can only provide audial or tactile clues as to the Products' slack-fill. But the same basic principle applies: the possibility that manipulating a package might yield additional insight into its contents does not exculpate non-functional slack-fill (just as accurate net weight disclosures do not). The possibility of manipulating a partially transparent package (that has a window) to discover the truth about it does not mitigate the false statement conveyed by the disproportionately large size of the product packaging. Likewise the existence of true label statements regarding weight and quantity (if any) do not diminish Defendant's wrongdoing in using a false and misleading packaging size.

79.    Many Class members, including Plaintiff DURAN, purchased the Products at movie theaters. In this context it was not logistically possible to manipulate packages before purchase. As explained above, even when consumers physically could have manipulate the Product packages before purchase, it is not reasonably expected or required of them. Considering the actual circumstances of the movie theater Product purchases, for many Class members there was no opportunity whatsoever to discover that the Products are underfilled.

**The Products' Packaging is Misleading Because it Misrepresents the Volume of Candy Contained Within, Regardless of Whether Label Statements Regarding Weight are True**

80.    Even if Defendant's net weight disclosures are accurate, such does not eliminate this basic deception caused by Defendant's false representation of quantity because the mere presence of a true statement does not cure associated fraudulent statements. The FDA has confirmed this in unequivocal terms:

> FDA disagrees with the comments that stated that net weight statements protect against misleading fill. FDA finds that the presence of an accurate net weight statement does not eliminate the misbranding that occurs when a container is made, formed, or filled so as to be misleading.

58 FR 64123, 64128 [emphasis added].

Section 403(e) of the act requires packaged food to bear a label containing an accurate statement of the quantity of contents. This requirement is separate and in addition to section 403(d) of the act. <u>To rule that an accurate net weight statement protects against misleading fill would render the prohibition against misleading fill in section 403(d) of the act redundant.</u> In fact, Congress stated (S. Rept. No. 493, 73d Cong., 2d sess. 9 (1934)) in arriving at section 403(d) of the act that that section is "intended to reach deceptive methods of filling where the package is only partly filled and, <u>despite the declaration of quantity of contents on the label</u>, creates the impression that it contains more food than it does." Thus, Congress clearly intended that failure to comply with either section would render a food to be misbranded.

58 FR 64123, 64128-64129 [emphasis added].

81.    Independently from the text on the Product labels and regardless of their text's accuracy or inaccuracy, the size of the Product packaging makes a representation about the quantity of candy it contains. For Defendant's Products, this representation is false. False product representations are false and unlawful even if a manufacturer also makes some true claims about its product.

82.    Even if consumers had come to expect significant slack-fill in boxed candy products, this too would not have eliminated Defendant's deception. The FDA has stated that "although consumers may become used to the presence of nonfunctional slack-fill in a particular product or product line, the recurrence of slack-fill over an extended period of time does not legitimize such slack-fill if it is nonfunctional." 58 FR 64123, 64131.

83.    The Products are misbranded regardless of any disclosures about contents settling and regardless of whether or not weight is labeled accurately. Under Federal regulations, "label statements cannot correct nonfunctional or misleading fill." Misleading Containers; Nonfunctional Slack-Fill, 58 Fed. Reg. 64123-01, 64129 (Dec. 6, 1993) (codified at 21 C.F.R. pt. 100).

84.    As the FDA explains in the Federal Register:

Consumers develop expectations as to the amount of product they are purchasing based, at least in part, on the size of the container. The congressional report that

31

accompanied the FPLA stated: "<u>Packages have replaced the salesman.</u> Therefore, it is urgently required that the information set forth on these packages be sufficiently adequate to apprise the consumer of their contents and to enable the purchaser to make value comparisons among comparable products" (H.R. 2076, 89th Cong., 2d sess., p. 7 (September 23, 1966)). <u>Thus, packaging becomes the "final salesman" between the manufacturer and the consumer, communicating information about the quantity and quality of product in a container.</u> Further, Congress stated (S. Rept. 361, supra at 9) that "<u>Packages only partly filled create a false impression as to the quantity of food which they contain despite the declaration of quantity of contents on the label.</u>"

58 Fed. Reg. 64123-01, 64131 (Dec. 6, 1993) (codified at 21 C.F.R. pt. 100) (emphasis added).

85.     The presence of true label statements on the Products' packaging regarding weight and number of servings, if any, would not and could not mitigate the false implicit statement of quantity made by the package size. Reasonable consumers such as Plaintiff and the Class expected no more air in the packaging than would be present in other candies such as Milk Duds®. Consumers were injured to the extent that Defendant under-filled the Product containers. Plaintiff and the Class' damages are simply the proportion of the Product purchase price that Defendant collected from Plaintiff and the Class equivalent to the percent of non-functional slack-fill.

86.     Courts have noted the incorporation of FDA regulations into New York law in evaluating claims brought under NY GBL § 349. *See Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG) (RML), 2010 U.S. Dist. LEXIS 73156, at *13 (E.D.N.Y. July 21, 2010) ("New York's Agriculture and Marketing law similarly provides in relevant part that food shall be deemed misbranded '[i]f its labeling is false or misleading in any particular,' and incorporates the FDCA's labeling provisions").

**An Accurate Unit Count Could Not Cure Defendant's Deception**

87.     Defendant's false representation of quantity, created by the **size** of the Product packages, cannot be cured by a **written** weight or count representation. A disclosure that

32

Plaintiff's box contained a particular number of pieces of candy would not establish its fill level because it implies nothing about the *size* of those pieces – and thus about the amount of candy that is actually in the box. As explained in *United States v. 174 Cases*:

> The question was not whether the ordinary purchaser would expect to find a particular number of individual candies in the box but whether such a purchaser would expect to find more of the Delson box filled. For example, the purchaser of a crate of apples opens the crate and finds it half filled. To determine whether he was deceived we do not ask whether he expected to find a particular number of individual apples in the crate. We do ask whether he expected to find more of the crate filled. This is the pertinent question. People do not think in terms of the number of individual mints when buying them in containers.

*United States v. 174 Cases*, 287 F.2d 246, 247-48 (3d Cir. 1961)

*See also Goldemberg v. Johnson & Johnson Consumer Cos*., 8 F. Supp. 3d 467, 479-80 (S.D.N.Y. 2014) ("Although the presence of a disclaimer or other clarifying language may defeat a claim of deception, the Court cannot hold as a matter of law that the product labels are not misleading to a reasonable consumer) (quotations and citation omitted); *see also Hughes v. Ester C Co*., 930 F. Supp. 2d 439, 464 (E.D.N.Y. 2013) ("[a]t this early stage of the litigation, it cannot be determined whether a disclaimer . . . eliminates the possibility of a reasonable consumer being misled . . ."); *Ackerman v. Coca-Cola Co.*, No. 09- CV-0395, 2010 U.S. Dist. LEXIS 73156, at *62-63 (E.D.N.Y. July 21, 2010) ("[T]he presence of a nutritional panel, though relevant, does not as a matter of law extinguish the possibility that reasonable consumers could be misled by [the defendant]'s labeling and marketing").

88.    In any case, the Product boxes do not contain an actual unit count, although an unusually diligent consumer could derive the count by multiplying the number of servings by the number of pieces per serving.

**Even an Excessively Diligent Consumer Would be Deceived by the Product Labels because Defendant Falsely Depicts the Candy Size on the 3.5 oz. and 10.5 oz. Products**

89.     An unusually suspicious and excessively diligent consumer who carefully examined the packaging of the 3.5 oz. and 10.5 oz. Products would ultimately be **even more mislead** by Defendant's Products than an ordinary consumer because those Products' labels falsely represent that each piece of candy is much larger than it actually is. As discussed above, an ordinary reasonable consumer infers the quantity of packaged food by the size of that product's packaging, and such reliance is reasonable. Any product package that misleads ordinary reasonable consumers is in violation of the applicable consumer protection laws. Defendant's Products are misleading to ordinary reasonable consumers, regardless of unusual means that some consumers might employ to determine how much candy is in the Products.

90.     Nonetheless, an excessively diligent consumer might take extraordinary measures to determine the quantity of food in a package. Such a consumer might also calculate the number of pieces of candy per box from the nutrition label. Such a consumer might then rely on the depicted candy size to determine the total volume of the candy in the Product packages. Such a consumer would be misled into believing that the Product has far more candy than it does due to the falsely sized images, which are larger than the actual candy pieces. This false impression would reinforce, and be in addition to, the deception perpetrated upon reasonable consumers who are misled by the size of the Product boxes.

91.     In other words, even if a consumer calculated the number of pieces of candy from the nutrition label, such a consumer would still be misled into believing that the Product package contained no non-functional slack-fill because that consumer would falsely believe that the Products contain a small number of relatively large pieces of candy.

92.     Junior Mints® candy pieces measure approximately 0.75 inches in diameter.



93.     On the 3.5 oz. Product box, the pieces of Junior Mints® candy pieces are depicted as being 25% larger than they really are[7]:



Typical piece of Junior Mints® candy.

Oversized images of Junior Mints® candy pieces.

The picture on the 3.5 oz. Product box is **25% larger** than the actual candy within.

---

[7] The pieces of candy are depicted as being approximately 0.9375 inches wide, or $\frac{15}{16}$ of an inch. This is 25% larger than they really are: $\frac{0.9375 - 0.75}{0.75} \times 100\% = 25\%$.

94.     On the 10.5 oz. Product box, the pieces of Junior Mints® candy pieces are depicted as being 83% larger than they really are[8]:



95.     The false candy images misrepresent the quantity of candy in the Product boxes by misstating the size of individual pieces of candy.

96.     As discussed above, a reasonable consumer is not expected or required to undertake extraordinary measures to evaluate whether or not the box contains non-functional slack-fill. A consumer is not required to shake or otherwise manipulate a box. Likewise, a consumer is: a) not required to perform mathematical calculations to determine the number of pieces of food in a box; b) not required to multiply the number of pieces by the size of each piece to determine the volume filled by the box's contents; and c) not required to subtract the estimated

---

[8] The pieces of candy are depicted as being approximately 1.375 inches wide, or $1\frac{3}{8}$ of an inch. This is 83% larger than they really are: $\frac{1.375 - 0.75}{0.75} \times 100\% = 83\%$.

volume of food from the total volume of the box to determine the amount of airspace within. Nonetheless, **even if** a consumer attempted to perform those calculations to estimate the amount of candy in the 3.5 oz. or 10.5 oz. Products, the false images would lead her to the incorrect conclusion that the box was substantially full.

97.     The net weight, serving size, and pieces per serving disclosures on the package are fundamentally not the type of disclosure that could cure a false impression of quantity engendered by excessive slack-fill in packaged food. In the case of the 3.5 oz. and 10.5 oz. Products, these disclosures combine with the Products' false depictions of unit size to further mislead diligent consumers.

**Plaintiffs and the Class Were Injured as a Result of Defendant's Deceptive Conduct**

98.     Plaintiffs and Class members were injured as the result of Defendant's deceptive conduct because they paid money for less product than Defendant represented they would be receiving.  Since they would not have agreed to this exchange had they known the truth, they were deprived of the benefit of their bargain, receiving less candy than was promised to them through the size of the Product packaging. In order for Plaintiffs and Class members to be made whole, they must be compensated in an amount equal to the proportion of the purchase price equal to the percentage of non-functional slack-fill in the Product, which is equivalent to the amount of product Plaintiffs and the Class paid for that Defendant did not-deliver. *See Lazaroff v. Paraco Gas Corp.*, 2011 NY Slip Op 52541(U), ¶ 6, 38 Misc. 3d 1217(A), 1217A, 967 N.Y.S.2d 867, 867 (Sup. Ct.) ("Plaintiff alleges that, had he understood the true amount of the product, he would not have purchased it, and that he and the purported members of the class paid a higher price per gallon/pound of propane and failed to receive what was promised and/or the benefit of his bargain, i.e., a full 20 pound cylinder and the amount of propane he was promised…Thus, plaintiff has properly alleged injury. Accordingly, the court finds that the

37

plaintiff has stated a claim for a violation of GBL § 349."); *Waldman v. New Chapter*, Inc., 714 F. Supp. 2d 398, 406 (E.D.N.Y. 2010) ("Plaintiff alleges that, had she understood 'the true amount of the product,' she 'would not have purchased' it… Thus, Plaintiff has properly alleged injury. Accordingly, Plaintiff's § 349 claim survives Defendant's motion); *Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489 (KMK), 2016 U.S. Dist. LEXIS 107097, at *51-52 (S.D.N.Y. Aug. 11, 2016) ("Indeed, in his Complaint, Plaintiff seeks monetary damages on the grounds that he 'would not have paid the premium price he paid' to buy the Products had he 'known the truth.'… Case law makes clear that this is sufficient at the motion-to-dismiss phase for a § 349 claim to survive.").

## CLASS ACTION ALLEGATIONS

99.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities in the United States who made retail purchases of the Products during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Nationwide Class").

In the alternative, Plaintiffs DANIEL and DURAN seek to represent:

> All persons or entities in New York who made retail purchases of the Products during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the New York Class").

Also in the alternative, Plaintiff PERKINS seeks to represent:

> All persons or entities in Mississippi who made retail purchases of the Products during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Mississippi Class").

38

100.    The proposed Classes exclude current and former officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, Defendant's legal representatives, heirs, successors, assigns, and any entity in which they have or have had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

101.    The members of the Classes are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through the appropriate discovery, Plaintiffs believes that there are thousands of members in the proposed Classes. Other members of the Classes may be identified from records maintained by Defendant and may be notified of the pendency of this action by mail, or by advertisement, using the e form of notice similar to that customarily used in class actions such as this.

102.    Plaintiffs' claims are typical of the claims of the members of the Classes as all members of the Classes are similarly affected by Defendant's wrongful conduct.

103.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes in that Plaintiffs have no interests antagonistic to those of the other members of the Classes. Plaintiffs have retained experienced and competent counsel.

104.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the Classes to individually seek redress for the wrongful conduct alleged herein.

105.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. Among the common questions of law and fact to the Classes are:

i.    Whether Defendant labels, packages, markets, advertises and/or sells Products to Plaintiffs and Class members, using false, misleading and/or deceptive packaging and labeling;

ii.   Whether Defendant's actions constitute violations of 21 U.S.C. § 343(d);

iii.  Whether Defendant omitted and/or misrepresented material facts in connection with the labeling, packaging, marketing, advertising and/or sale of its Products;

iv.   Whether Defendant's labeling, packaging, marketing, advertising and/or selling of its Products constitute an unfair, unlawful or fraudulent practice;

v.    Whether the packaging of the Products during the relevant statutory period constitutes unlawful non-functional slack-fill;

vi.   Whether, and to what extent, injunctive relief should be imposed on Defendant to prevent such conduct in the future;

vii.  Whether the members of the Classes have sustained damages as a result of Defendant's wrongful conduct;

viii. Whether Defendant purposely chose non-transparent Product packaging so that Plaintiffs and Class members would not be able to see the amount of slack-fill contained in the Products;

ix.   The appropriate measure of damages and/or other relief;

x.    Whether Defendant has been unjustly enriched through its scheme of using false, misleading and/or deceptive labeling, packaging or misrepresentations, and;

xi.   Whether Defendant should be enjoined from continuing its unlawful practices.

106.   The membership of the Classes is readily definable, and prosecution of this action as a class action will reduce the possibility of repetitious litigation. Plaintiffs know of no

difficulty which will be encountered in the management of this litigation that would preclude its maintenance as a class action.

107.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual Class member are too small to make it economically feasible for an individual Class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will prevent the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

108.    The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole.

109.    The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Classes predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

110.    The prosecution of separate actions by members of the Classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. Additionally, individual actions may be dispositive of the interest of all members of the Classes, although certain Class members are not parties to such actions.

111.    Defendant's conduct is generally applicable to the Classes as a whole and Plaintiffs seeks, *inter alia*, equitable remedies with respect to the Classes as a whole. As such,

Defendant's systematic policies and practices make declaratory relief appropriate with respect to the Classes as a whole.

112.    A Nationwide Class is particularly appropriate because the consumer protection law of all 50 states and the District of Columbia mirror federal law and are therefore substantively identical.

# CAUSES OF ACTION

## COUNT I

### INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar common law of other states and the District of Columbia to the extent New York common law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

113.    Plaintiffs realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

114.    Plaintiffs bring this claim on behalf of themselves and other members of the Class for an injunction for violations of New York's Deceptive Acts or Practices Law, General Business Law ("NY GBL") § 349.

115.    Alternatively, should the Court not certify Plaintiffs' proposed Nationwide Class, Plaintiff DANIEL and Plaintiff DURAN bring this claim on behalf of themselves and other members of the New York Class for an injunction for violations of New York's Deceptive Acts or Practices Law ("NY GBL § 349").

116.    NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

117.    Under the New York Gen. Bus. Code § 349, it is not necessary to prove justifiable reliance. ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law [§] 349 . . . claims, it was error. Justifiable reliance by the plaintiffs is not an element of the statutory claim." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. App. Div. 2012) (internal citations omitted)).

118.    The practices employed by Defendant, whereby Defendant advertised, promoted, marketed and sold its Product in packaging containing non-functional slack-fill are unfair,

deceptive and misleading and are in violation of the NY GBL § 349. Moreover, New York State law broadly prohibits the misbranding of foods in language identical to that found in regulations promulgated pursuant to the FDCA § 403 (21 U.S.C. 343(d)). Under New York Agm. Law § 201, "[f]ood shall be deemed to be misbranded … If its container is so made, formed, colored or filled as to be misleading."

119.    The foregoing deceptive acts and practices were directed at consumers.

120.    Defendant should be enjoined from packaging its Product with non-functional slack-fill as described above pursuant to NY GBL § 349, New York Agm. Law § 201, and the FDCA, 21 U.S.C. § 343(d).

121.    Plaintiffs are at risk of several types of future injury, each of which justifies the imposition of an injunction. First, Defendant has misleadingly manufactured many different sizes of products with non-functional slack-fill, and so Plaintiffs may be deceived into purchasing a slack-filled Tootsie Roll® Product again (whether the exact same size and flavor as before or not), causing the same type of economic injury as enumerated in the complaint.

122.    Second, Plaintiffs are no longer able to rely on defendant's representations, regardless of whether the representations are true or false. Third, Plaintiffs might hesitate to purchase Defendant's products even if it ceases its unlawful labeling practices and begins packaging its products without slack-fill. If the products are no longer sold with non-functional slack-fill, then Plaintiffs could not take advantage of those products because they have been misled into believing that the products have non-functional slack-fill

123.    The 9th Circuit has recently embraced this approach to analyze injury in consumer fraud cases:

> We hold that a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now

44

knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an "actual and imminent, not conjectural or hypothetical" threat of future harm. [*Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S. Ct. 1142, 1148 (2009).] Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future. In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to. *See, e.g.*, [*Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012)]; *Lilly v. Jamba Juice Co.*, No. 13-cv-02998-JT, 2015 U.S. Dist. LEXIS 34498, 2015 WL 1248027, at *4 (N.D. Cal. Mar. 18, 2015) ("[U]nless the manufacturer or seller has been enjoined from making the same representation, [the] consumer . . . won't know whether it makes sense to spend her money on the product.").

*Davidson v. Kimberly-Clark Corp.,* 873 F.3d 1103, 1115 (9th Cir. 2017).

124.    The Court should follow the lead of California Federal Courts and recognize that a plaintiff may be injured after she learns of a manufacturer's deception, even though she is unlikely to fall victim to the exactly the same scheme again in exactly the same manner. To hold otherwise would immunize manufacturers and render injunctive relief impossible in consumer fraud class action lawsuits – if learning of a deception removed a plaintiff's standing to seek an injunction, then wrongdoers could violate the law with impunity, defeating the purpose of consumer protection statutes.

125.    Plaintiffs on behalf of themselves and all others similarly situated, respectfully demands a judgment enjoining Defendant's conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

**COUNT II**

**DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
(DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)**

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar
common law of other states and the District of Columbia to the extent New York common
law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the
New York Class)**

126.     Plaintiffs reallege and incorporate herein by reference the allegations contained in

all preceding paragraphs, and further allege as follows:

127.     Plaintiffs bring this claim on behalf of themselves and other members of the Class

for violations of NY GBL § 349.

128.     Alternatively, should the Court not certify Plaintiffs' proposed Nationwide Class,

Plaintiff DANIEL and Plaintiff DURAN bring this claim on behalf of themselves and other

members of the New York Class for Defendant's violations of NY GBL § 349.

129.     Any person who has been injured by reason of any violation of NY GBL § 349

may bring an action in their own name to enjoin such unlawful acts or practices, an action to

recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court

may, in its discretion, increase the award of damages to an amount not to exceed three times the

actual damages up to one thousand dollars, if the court finds the defendant willfully or

knowingly violated this section. The court may award reasonable attorney's fees to prevailing

plaintiffs.

130.     By the acts and conduct alleged herein, Defendant committed unfair and/or

deceptive acts and practices by misbranding its Product so that it appears to contain more in the

packaging than is actually included.

131.     The practices employed by Defendant, whereby Defendant advertises, promotes,

markets and sells its' Products in packages containing non-functional slack-fill are unfair,

deceptive, misleading and are in violation of the NY GBL § 349, New York Agm. Law § 201 and the FDCA (21 U.S.C. § 343(d)) in that said Product is misbranded.

132.   The foregoing deceptive acts and practices were directed at consumers.

133.   Plaintiffs and the other Class members suffered a loss as a result of Defendant's deceptive and unfair trade practices. Specifically, as a result of Defendant's deceptive and unfair acts and practices, Plaintiffs and the other Class members suffered monetary losses from the purchase of Product, i.e., receiving less than the capacity of the packaging due to non-functional slack-fill in the Products. In order for Plaintiffs and Class members to be made whole, they must receive a refund of the purchase price of the Products equal to the percentage of non-functional slack-fill in it.

<div align="center">

**COUNT III**

**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW §§ 350 AND 350-a(1)
(FALSE ADVERTISING)**

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar
common law of other states and the District of Columbia to the extent New York common
law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the
New York Class)**

</div>

134.   Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs and further allege as follows:

135.   Plaintiffs bring this claim individually, as well as on behalf of members of the Nationwide Class, for violations of NY GBL § 350.

136.   Alternatively, should the Court not certify Plaintiffs' proposed Nationwide Class, Plaintiffs DANIEL and DURAN bring this claim individually and on behalf of the members of the New York Class for violations of NY GBL § 350.

137.   Defendant has been and/or is engaged in the "conduct of … business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

138.    New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising means "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a(1).

139.    Pursuant to the FDCA as implemented through 21 C.F.R. § 100.100, package size is an affirmative representation of quantity. Thus, the non-functional slack-fill in Defendant's Product constituted false advertising as to the quantity of candy contained therein. Defendant caused this false advertising to be made and disseminated throughout New York and the United States. Defendant's false advertising was known, or through the exercise of reasonable care should have been known, by Defendant to be deceptive and misleading to consumers.

140.    Defendant's affirmative misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers purchasing the Product were, and continue to be, exposed to Defendant's material misrepresentations.

141.    Defendant has violated N.Y. Gen. Bus. Law § 350 because its misrepresentations and/or omissions regarding the Product, as set forth above, were material and likely to deceive a reasonable consumer.

142.    Plaintiffs and members of the Class have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising. In purchasing the Product, Plaintiffs and members of the Class relied on the misrepresentations regarding the quantity of the Product that was actually candy rather than non-functional slack-fill. Those representations were false and/or misleading because the Product contains substantial hidden

non-functional slack-fill. Had Plaintiffs and the Class known this, they would not have purchased the Product or been willing to pay as much for it.

143.    Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiffs and members of the Class seek monetary damages (including actual, minimum, punitive, treble, and/or statutory damages), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

<p style="text-align:center"><strong>COUNT IV</strong></p>

<p style="text-align:center"><strong>VIOLATIONS OF THE MISSISSIPPI CONSUMER PROTECTION ACT (MISS. CODE. ANN. § 75-24-1, ET SEQ.</strong></p>

<p style="text-align:center"><strong>(brought in the alternative on behalf of the Mississippi Class, to the extent New York law is inapplicable to Mississippi Class members)</strong></p>

144.    Plaintiff PERKINS realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

145.    Should the Court not certify Plaintiffs' proposed Nationwide Class, Plaintiff PERKINS brings this claim in the alternative individually and on behalf of the members of the Mississippi Class for violations of THE MISSISSIPPI CONSUMER PROTECTION ACT, MISS. CODE. ANN. § 75-24-1, ET SEQ. ("Mississippi CPA").

146.    The Mississippi CPA makes unlawful "Unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce" Miss. Code Ann. § 75-24-5(1). Unfair or deceptive trade practices include, but are not limited to: "(e) Representing that goods or services have . . . quantities that they do not have"; and "(i) Advertising goods or services with intent not to sell them as advertised." MISS. CODE ANN. § 75-24-5(2).

147.    Defendant has been and/or is engaged in commerce within the meaning of the Mississippi CPA.

148. By Representing that the Products have quantities that they do not have, Defendant has violated § 75-24-5(2)(e). By advertising the Products with intent not to sell the quantities advertised, Defendant has violated § 75-24-5(2)(i).

149. Pursuant to the FDCA as implemented through 21 C.F.R. § 100.100, package size is an affirmative representation of quantity. Thus, the non-functional slack-fill in Defendant's Product constituted false advertising as to the quantity of candy contained therein. Defendant caused this false advertising to be made and disseminated throughout Mississippi and the United States. Defendant's false advertising was known, or through the exercise of reasonable care should have been known, by Defendant to be deceptive and misleading to consumers.

150. Defendant's affirmative misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers purchasing the Product were, and continue to be, exposed to Defendant's material misrepresentations.

151. Defendant has violated the Mississippi CPA because its misrepresentations and/or omissions regarding the Products, as set forth above, were material and likely to deceive a reasonable consumer.

152. Plaintiffs and members of the Mississippi Class have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising. In purchasing the Products, Plaintiff PERKINS and members of the Mississippi Class relied on the misrepresentations regarding the quantity of the Product that was actually candy rather than non-functional slack-fill. Those representations were false and/or misleading because the Product contains substantial hidden non-functional slack-fill. Had Plaintiff PERKINS and the Mississippi Class known this, they would not have purchased the Product or been willing to pay as much for it.

153.     Plaintiffs seek actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

## COUNT V

## COMMON LAW FRAUD

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar common law of other states and the District of Columbia to the extent New York common law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

154.     Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

155.     Through its Products' packaging, Defendant intentionally made materially false and misleading representations regarding the quantity of candy that purchasers were actually receiving.

156.     Plaintiffs and Class members were induced by, and relied upon, Defendant's false and misleading representations and did not know the truth about the Products at the time they purchased them.

157.     Defendant knew of its false and misleading representations. Defendant nevertheless continued to promote and encourage customers to purchase the Product in a misleading and deceptive manner, intending that Plaintiffs and the Class rely on its misrepresentations.

158.     Had Plaintiffs and the Classes known the actual amount of candy they were receiving, they would not have purchased the Products.

159.     Plaintiffs and Class members have been injured as a result of Defendant's fraudulent conduct.

160.    Defendant is liable to Plaintiffs and Class members for damages sustained as a result of Defendant's fraud. In order for Plaintiffs and Class members to be made whole, they need to receive a refund consisting of the percentage of the purchase price equal to the percentage of non-functional slack-fill in the Products.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated, seek judgment against Defendant, as follows:

a.  An Order that this action be maintained as a class action and appointing Plaintiffs as representative of the Nationwide Class or, in the alternative, the New York Class;

b.  An Order appointing the undersigned attorney as class counsel in this action;

c.  Restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

d.  All recoverable compensatory and other damages sustained by Plaintiffs and the Classes;

e.  Actual and/or statutory damages for injuries suffered by Plaintiffs and the Classes and in the maximum amount permitted by applicable law;

f.  An order (i) requiring Defendant to immediately cease its wrongful conduct as set forth in this Complaint; (ii) enjoining Defendant from continuing to misrepresent and conceal material information and conduct business via the unlawful, unfair and deceptive business acts and practices complained of herein; (iii) ordering Defendant to engage in a corrective advertising campaign; and (iv) requiring Defendant to reimburse Plaintiffs and all members of the Classes in an amount up to the purchase price of the Products;

g.  Statutory pre-judgment and post-judgment interest on any amounts;

h.  Payment of reasonable attorneys' fees and costs; and

i.   Such other relief as the Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs, individually and on behalf of all others similarly situated, hereby demands a jury

trial on all claims so triable.


Dated: January 2, 2018

<div style="margin-left: 40%;">

Respectfully submitted,


<u>/s/ C.K. Lee</u>
By:  C.K. Lee, Esq.


**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1180
Fax: 212-465-1181
*Attorneys for Plaintiffs and the Classes*

</div>